# Philadelphia & Reading Railroad *v.* River Front Railroad, Appellant.

*Railroads—Agreement for joint control of track.*

Two railroad companies contracted to build a connecting river front railroad for their joint use.   The expense of maintaining the line was to be in proportion to the actual tonnage represented by the two companies. The rules for the management of the joint line were drawn up and signed by the managers of the two railroad companies.   *Held,*

(1) The rules, adopted by the joint action of the officers of the companies for the management and maintainance of that part of the River Front Railroad that is the subject of this contention, amount to an agreement or contract upon the subject to which they relate.

(2) Such contract is not irrevocable, but is subject to such modification as circumstances may require in order to promote the purpose in view and the interests of the parties.

(3) Such changes cannot be made arbitrarily at the will of either party, but they require the concurrence of both.

(4) Either party may give suitable notice of its purpose to withdraw from the arrangement at and after a day named.   Thereafter, if the parties cannot readjust their relations to each other, the courts must make such ad interim orders as will protect the rights of the parties and secure the preservation and operation of the road.

(5) In disposing of such a question the relative ownership, tonnage, and other relevant circumstances should be considered.

Argued May 2, 1895. Appeal, No. 159, Jan. T., 1895, by defendant, from decree of C. P. No. 4, Phila. Co., Dec. T., 1889, No. 367, on bill in equity. Before GREEN, WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ. WILLIAMS, J., presiding. Affirmed.

Bill in equity to compel the performance of 'covenants contained in a contract.

The case was referred to Charles E. Morgan, Jr., Esq., as master, who reported as follows :

" By the bill it is averred that the plaintiff, the Philadelphia & Reading Railroad Company, was incorporated under the act of assembly of this commonwealth, entitled ' An act to authorize the governor to incorporate the Philadelphia & Reading Railroad Company,' approved April 4, 1833, under which it constructed and now owns the railroad extending from the city of Philadelphia to various points in the interior of this state; that the terminus of the road is in the city of Philadelphia at a point known as Port Richmond, the southern boundary of the property of said company at that place being Cumberland street, in the Eighteenth ward of said city. That by a supplement to said act of assembly, approved April 12, 1864, entitled ' An act extending so much of the provisions of the act to incorporate the Pennsylvania Railroad Company, approved April 13, 1846, as relates to the making of lateral or branch railroads to the Lebanon Valley and Philadelphia & Reading Railroad Companies,' the right to make lateral or branch roads, leading from the main line of its railroad to places or points in any of the counties into or through which the said main line may pass, was conferred upon the Philadelphia & Reading Railroad Company. That the defendant the River Front Railroad Company, was incorporated on the 15th day of May, 1876, under the provisions of an act of assembly, approved April 4, 1868, entitled ' An act to authorize the formation and regulation of railroad companies,' ' for the purpose of constructing, operating, and maintaining a railroad for public use for the conveyance of persons and property to be located in the

city and county of Philadelphia and to extend from the point
of connection with the Pennsylvania Railroad as then located,
constructed, and in use at Delaware avenue and Dock street,
by such route as should be approved by the select and common
councils of the city of Philadelphia, to a point of connection
with the Philadelphia & Trenton Railroad at its Kensington
depot grounds at Harrison and Leib streets.' That by the
twelfth section of said act of April 4, 1868, it is provided that
' no corporation formed thereunder shall enter upon or occupy
any street, lane, or alley in any incorporated city without the
consent of such city being first obtained.' That in 1877 the
River Front Railroad Company and the Philadelphia & Read-
ing Railroad Company each proposed building a branch rail-
road upon the same streets in the city of Philadelphia, and it
was agreed between them that the two companies should build
and own jointly a single line between Callowhill and Cumber-
land streets, and an ordinance of the city of Philadelphia was
passed and approved May 21, 1877, entitled ' An ordinance to
authorize the River Front Railroad Company and the Phila-
delphia & Reading Railroad Company to severally and jointly
occupy and use certain streets for railroad purposes.' That the
legal effect of the ordinance was to give the consent of the city
of Philadelphia to both of said railroad companies to enter on
and occupy the streets named therein. That in accordance with
the agreement aforesaid, and the provisions of the ordinance
mentioned, the two railroad companies did construct jointly in
the year 1881 a double-track railroad extending from the south
side of Cumberland street along Beach street to Shackamaxon
street ; thence through private property to Delaware avenue-
and along Delaware avenue to Callowhill street, in the Eleventh
ward of the said city, and the cost of construction was borne
equally by the said two companies, and the same is owned by
them as equal tenants in common. That the said railroad until
May 1, 1889, was maintained and operated by both the said com-
panies jointly under the terms of an agreement, a copy of which,
marked ' Exhibit D,' is annexed as part of the bill. That at pres-
ent the River Front Railroad Company is leased and operated
by the Pennsylvania Railroad Company, a corporation existing
under the laws of this commonwealth, and that the president of
the said River Front Railroad Company is one of the vice presi-

dents of the Pennsylvania Railroad Company, and the board of directors of the former company is composed entirely of persons who are also directors of the latter. That the railroad of the River Front Railroad Company extends both north and south of the joint railroad before mentioned, and connects the railroad of the Pennsylvania Railroad Company at Dock street, in the Fifth ward of the city of Philadelphia, with the Philadelphia & Trenton Railroad Company, which is leased and operated by the Pennsylvania Railroad, at a point in the Twenty-fifth ward of said city. That the said railroad between Callowhill street and Cumberland street is also connected with the main line of the Philadelphia & Reading Railroad at a point just north of Cumberland street, and the traffic of said railroad between Callowhill street and Cumberland street is exclusively transported in cars to the separate railroads of the Pennsylvania Railroad and the Philadelphia & Reading Railroad Company. Numerous warehouses, wharves, and other places of business are situated along the line of the common railroad, and since its construction, turnouts and sidings have been constructed connecting the same with said warehouses, wharves, and places of business. That in pursuance of the agreement referred to of May 1, 1882, Exhibit D, the plaintiff and defendant alternated in taking charge of the maintenance of said line of railroad on Delaware avenue up to the 1st of May, 1887, when it became the right of. the Philadelphia & Reading Railroad to take charge of the maintenance of said line under said agreement. That said company was then in the hands of receivers, and, at the instance of the River Front Railroad Company, permitted that company to take charge of the maintenance of said line on Delaware avenue from the 1st of May, 1887, to the 1st of May, 1888. That this arrangement was entirely provisional and only had application to the year beginning May 1, 1887, and ending May 1, 1888. That the River Front Railroad continued in charge of said railroad during the year extending from May, 1888, to May, 1889. That prior to the 1st of May, 1889, the plaintiff desired to take charge of the maintenance of the line for the year extending from the 1st of May, 1889, in accordance with said agreement, and notified the River Front Railroad Company of its purpose so to do, and to this end entered into possession of the railroad on Delaware avenue. That the River Front Railroad

Company then, unlawfully and in violation of the terms of said agreement, procured a large number of men, and placed them along the line of the railroad, and forcibly prevented the plaintiff from making the repairs necessary to maintain the line on said Delaware avenue, and further obstructed and interfered with the plaintiff in the exercise of the rights vested in it by the terms of the agreement in regard to the maintenance of said road. That in order to preserve the public peace, the mayor of the city of Philadelphia directed the maintenance of said line on Delaware avenue to be taken in charge of the Department of Public Safety of the city of Philadelphia, and that the road since May 1, 1889, has been maintained by the mayor of the city of Philadelphia, acting through the Department of Public Safety. That the River Front Railroad Company denies the right of the Philadelphia & Reading Railroad Company to take charge of the said road at any time, under said agreement, and the plaintiff is thereby deprived of the rights vested in it under the agreement, including the right to take charge and maintain said road.

" The bill concludes with a prayer for relief, in which the court is asked to decree that the defendant shall keep, preserve, and perform all the terms, covenants, and conditions of the agreement of May 1, 1882, and especially the covenant authorizing the Philadelphia & Reading Railroad Company, in each alternate year, to take charge of the maintenance of the line on Delaware avenue, as set forth in the agreement, and that an injunction be issued restraining the River Front Railroad Company, its officers and agents, from obstructing or interfering with the plaintiff, its officers and agents, in taking charge of and maintaining the said line during said period.

" The defendant in its answer admits the averments of the bill as to the incorporation of both parties to the suit, the passage of the ordinance of the city of Philadelphia of May 2, 1877, the execution and delivery to the city of their joint bond in accordance with the requirements of the ordinance, their joint contract for the construction of the road, the payment by each of one half of the cost thereof, the execution of the agreement for the operation, maintenance, and control of the same, made by them to take effect on May 1, 1882, and the subsequent operation and maintenance of the property thereunder, appar-

ently without dispute until April, 1887, when the correspondence between the parties began, set out in full in the appendix to the bill of complaint, pages 27 to 38, inclusive.

" It is not denied that, as alleged in the bill, at the instance of the defendant, the plaintiff, whose property was then in the possession of receivers appointed by the circuit court of the United States, permitted the defendant to remain in charge of maintenance during the year beginning May 1, 1887, when under the agreement, Exhibit D, plaintiff was entitled to assume control, that the defendant continued in charge during the succeeding year, and that at the termination of the latter period plaintiff notified the defendant of its purpose again to assume the maintenance of the property, which it attempted to carry out, but was prevented from so doing by the refusal of the defendant, and its subsequent resistance by force. Nor that thereupon, for the purpose of preserving the public peace, the mayor of the city took possession of the property, and has continued in possession of it since Feb. 1, 1889, maintaining it through the Department of Public Safety at the joint expense of both parties. It is averred, however, by the defendant, in justification of its assumption of the continuous control of maintenance to the exclusion of the plaintiff—

" 1. That the agreement, Exhibit D, of May 1, 1882, was merely tentative.

" 2. That the general manager of the plaintiff in his letter of May 17, 1887 (see page 26 of bill), declined, for alleged want of authority, to enter into a new arrangement with defendant as to maintenance of the road.

" 3. That inasmuch as under the agreement, which imposed the cost of maintenance on the parties respectively in proportion to the quantity of traffic furnished by each, the defendant was charged with eighty per centum thereof and the plaintiff with but twenty per centum, the control of maintenance ought to be exclusively in the former.

" 4. That the acquiescence of the plaintiff in the continuance of the defendant in control during the year ending May 1, 1888, amounted to an agreement or modification of the contract, which vested the right to maintenance continuously thereafter in defendant; the agreement as originally made in all other particulars remaining in full force and effect.

" 5. Conduct of plaintiff hostile to the interests of defendant, in endeavoring to afford connection with the road to the owners of a warehouse upon the line alleged to be acting in the interest of the Baltimore & Ohio Railroad Company.

" Each of the railroad companies, parties to this suit, was vested by the legislature with authority to use and occupy the streets of the city of Philadelphia for railroad purposes, provided the consent of the city were first obtained, that consent being an essential condition precedent to the lawful construction and operation by either of a railroad upon the public highways.

" The right of the plaintiff was derived from its charter and the act of assembly of June 9, 1874, P. L. 218, P. D. 1428, which, as construed in Duncan v. The Penna. R. R. Co., 7 W. N. C. 551; s. c., 94 Pa. 435, authorized the extension of its line along the streets of the city of Philadelphia upon receiving consent thereto by the city. This act in terms empowers ' cities, counties, and townships of the state to enter into contracts with any railroad companies whose roads enter their limits, whereby said railroad companies may relocate, change, or elevate their roads.'

" Authority to construct and operate a railroad on the said streets became vested in the defendant also under the General Railroad Laws of 1849, February 19, P. L. 83, P. D. 1417, and 1868, April 4, P. L. 62, P. D. 1414, upon receiving the consent of the city as required by section 12 of the latter statute, by which it is expressly provided that ' this act shall not be so construed . . . . as to authorize any corporation formed under the act to enter upon and occupy any street, lane, or alley in any incorporated city in this commonwealth without the consent of such city having been first obtained.'

" The right of a railroad company incorporated under the acts of assembly of 1849 and 1868, referred to, to locate, build, and open its railroad longitudinally along the public streets of a city upon receiving the assent of the municipal authority, is distinctly recognized in Phila., Germantown & Norristown R. R.'s App., 2 Walker's Cases, 291; Penna. R. R.'s App., 116 Pa. 55; Penna. R. R.'s App., 115 Pa. 525.

" In the case last cited (115 Pa.), on page 525, Mr. Justice TRUNKEY says, after referring to the acts of 1849 and 1868, ' A

company organized under the general statute may locate its railroad on a street or alley, because that statute expressly confers the power.'

" The requisite consent was given to both companies by the ordinance of the city of Philadelphia of May 31, 1877, section 2. (See appendix to bill, page 12.)

" By said section, it is ordained that ' The River Front Railroad Company and the Philadelphia & Reading Railroad Company are hereby authorized to occupy with a single-track railroad for the purposes and privileges mentioned in section 1 of the ordinance (ordinary railroad purposes and uses, or with a double track when the width of the street or avenue shall render the same practicable) the following streets and avenues, viz : Delaware avenue from the south side of Callowhill street to Shackamaxon street, Shackamaxon street from Delaware avenue to Beach street, and Beach street from Shackamaxon street to and across Cumberland street, to such point on the northeasterly side of Cumberland street as may be selected by the said Philadelphia & Reading Railroad Company.' . . . .

" The purpose of the ordinance, as stated at the close of said section 2, was to secure ' the construction and maintenance of a line of railroad for the free use of both railroad companies, so as that all manufacturers and business interests along said line shall have the full benefit of receiving from and delivering property to said roads.'

" Each company was to have the same rights as the other over the line to be constructed irrespective of the amount of traffic which they might respectively furnish for it.

" That the ordinance was so construed and understood by both parties in 1879 is manifested by their conduct.

" On Feb. 5, 1879, they jointly gave the bond required to be given to the city of Philadelphia (see Examiner's Report, page 4), and also jointly executed a contract for the construction of the line, in which each was bound for one half of the total cost. (See plaintiff's bill, Exhibit B, page 11.)

" And also thereafter, on May 1, 1882, entered into a joint contract for maintenance and operation, of which the following is a copy :

" ' AGREEMENT BETWEEN PHILADELPHIA & READING RAIL-
ROAD COMPANY AND THE RIVER FRONT RAILROAD COM-
PANY.

" ' *Rules for the government of the Railroad on Delaware Ave-
nue, Philada., between Cumberland St. and Callowhill street. Tak-
ing effect May 1st,* 1882.

" ' There shall be appointed a Joint Dispatcher, whose sole
duty shall be the traffic management of the line between Cum-
berland and Callowhill streets, on Delaware avenue.

" ' The maintenance of the line shall be divided between the
two interests in such a manner that the Engineer's department
of the Reading's interest shall have charge of the maintenance
of the line for twelve (12) months at a time, and that of River
Front Railroad for like periods, neither interest, except by an
agreement, to retain charge for a longer continuous period than
one year, it being understood that the first year's management,
dating from May 1st, 1882, and terminating April 30th, 1883,
shall be assumed by the River Front Railroad Company.

" ' The intention of the joint ownership is, that the cost of
maintaining the line, and all other expenses, except the pay of
the Dispatcher, shall be borne in proportion to the actual ton-
nage represented by the two interests, but the strict enforcement
of the actual tonnage method may by mutual consent, be sus-
pended and instead an estimated weight, to be agreed upon,
may be applied to each loaded car, which until the removal of
the actual weight method shall become the basis for determin-
ing the proportion of expenses chargeable to the respective in-
terests, or in lieu of either of the foregoing methods, having in
view more especially the avoidance of the expense that would
be incurred in keeping an accurate account of cars moved, and
so long as it shall be mutually satisfactory, it may be proper to
assume that there has been an equal division of the tonnage
between the respective interests of the parties to this agree-
ment, and the expenses may be so adjusted, subject, however,
to an immediate restoration of the tonnage basis whenever a
desire that such be done be expressed by either interest.

" ' The adjustment of the tonnage, and all other accounts ap-
pertaining to the operation and maintenance of the line, shall
be made quarterly through such officers as shall be designated
by the respective interests.

" ' The pay of the Dispatcher shall, be fixed by the joint interests, and each shall bear an equal share of the same, each interest paying direct to the Dispatcher their proportion of the salary, the purpose of this method being that the Dispatcher shall keep in constant mind, that as between the two interests he is a joint representative of a joint ownership; it is also agreed that under no circumstances will it be proper for either interest to pay to the Dispatcher more than one half of the agreed salary, and that an expression of dissatisfaction from either interest shall be considered a good and sufficient reason for the Dispatcher's removal.

" ' The charge for tolls and motive power, applying from May 1st, 1882, which each interest shall make and collect from Consignees or Shippers upon cars delivered or taken from private sidings, shall be one dollar ($1.00) per eight wheeled loaded car, which rate shall continue in force until changed by an agreement between the proper officers of the respective interests.

" ' All questions as to the Management of the joint line that may arise hereafter shall be referred to the General Managers of the joint interests, or to such officers as they may delegate for that purpose.'

" ' The foregoing has been approved and accepted on behalf of the Receivers of the Philada. & Reading Railroad Company

" ' By J. E. WOOTTEN, General Manager.'

" ' The foregoing has been approved and accepted on behalf of the River Front Railroad Company

" ' By O. E. McCLELLAN.'

" The rights of the companies under the contract were those of tenants in common. Neither had the power to terminate it, or to free itself from responsibility thereunder without the consent of the other, the contract being of a continuing nature, unlimited as to duration, and not containing any express power of defeasance reserved to either. It could therefore be annulled or changed only by mutual consent. See 1 Addison on Contracts, sec. 361.

" ' Where two or more persons enter into a contract of a continuing nature, one cannot by his own act discharge himself

from liability and put an end to the contract without the consent of the other.'    See also Great Northern Railway Co. v. The M. S. R. R. Co., 18 Law Times, O. S. 344.

" In that case the contract was between two railway companies providing for the right to run cars, etc., over each other's lines, and no term was fixed for the duration of the arrangement.

" The court, Vice Chancellor PARKER, held that the agreement was permanent and could only be terminated by consent of both parties.

" At the argument before the master the learned counsel for the defendant conceded the binding force and effect and permanent character of the agreement referred to, but contended that the correspondence between the parties, commencing with the letter from defendant's general agent to plaintiff's general superintendent, dated April 28, 1887, and their conduct thereafter, constituted a modification of the agreement as to the control of maintenance, and gave to the defendant the right thereto, continuously, from May 1, 1887, said contract in all other respects continuing in full force and effect.

" In the opinion of the master, however, there is no evidence to sustain this contention, or to justify a finding that plaintiff ever agreed to any alteration of the contract.

" Between the date of the agreement, May 1, 1882, and May 1, 1887, the property was maintained by the parties under its terms, each separately exercising control during alternate years.

" Shortly before the close of the year ending May 1, 1887, and while the defendant was in charge of maintenance, Mr. Latta, its general agent, wrote to plaintiff's superintendent the letter, a copy of which is found on page 5 of Examiner's Report, in which he suggests that the defendant remain in charge of maintenance until Mr. Pugh, who was its superintendent, could have a conference upon the subject of proposed alterations with Mr. McLeod, acting for plaintiff.    In this letter Mr. Latta writes :  ' We will therefore not turn the track arrangement over to your company on the 1st of May, as heretofore, until after the conference, if it is so agreed at that time.    Mr. Pugh is absent from the city, and I address you on the matter, asking that you allow the arrangement to stand at present until his

return, which will be on Saturday.' No conference appears to have taken place nor was there any reply to the letter until May 11, 1887, when the vice president of the plaintiff wrote to Mr. Pugh, referring to Mr. Latta's letter of April 28, 1887, stating that the supervisor of the Philadelphia & Reading Railroad Company was directed 'under the provisions of the agreement of May 1, 1882, to take charge of the maintenance of The River Front Railroad for the ensuing year,' calling attention to a reported order issued on behalf of the defendant, directing its supervisor not to transfer maintenance to plaintiff, and concluding with an assertion of the right of the plaintiff to control during the year 1887 and 1888, and a request for 'directions to the River Front Railroad officer, so that our (Reading's) supervisor may be permitted to take charge of the maintenance of this railroad as provided for in the agreement.'

" To this Mr. Pugh replied, May 13, 1887, that the arrangement which had theretofore prevailed, under the agreement (Exhibit D), for alternate control of maintenance had not been satisfactory to The River Front Railroad Company, which company he referred to as the 'owners of the road,' and he further suggested that it seemed to that company 'that it would be better to permit this work to remain in the hands of The River Front Railroad Company continuously.' He closes this letter as follows: 'I will therefore be glad if you can see your way clear to assent to The River Front Railroad Company continuing in charge of the track as suggested.' On May 17, 1887, Mr. McLeod, general manager of plaintiff, replied, denying that The River Front Company was the owner of the road, insisting that the course provided for in the agreement of May 1, 1882, be adhered to, suggesting lack of power in himself as general manager of plaintiff to assent to any substantial variation of the contract without special authority from his company or its receivers, and requesting a discussion of the proposed changes in the contract by Mr. Pugh and himself, and a submission of alterations which they might agree to recommend to the respective companies for action. No change in the situation occurred during the rest of the year ending May 1, 1888, and the River Front Company retained control of maintenance, and continued also during the year following, when, under the agreement, it was entitled to it.

On April 16, 1889, correspondence upon this subject was re-opened by the letter of that date from Mr. McLeod to Mr. Pugh, in which he stated that he had presented the matter of maintenance of the property to the board of managers of the Philadelphia & Reading Railroad Company, and that it had been determined 'that the Reading Company, under the provisions of. the agreement of 1882, should, as therein provided, take charge of the maintenance of the said railroad on the first day of May next.'

" A letter to the same effect was written by him on April 26, 1889. To this the defendant replied that the agreement of May 1, 1882, was merely tentative ; that The River Front Railroad Company contributed about eighty per cent of the traffic on the road, and to use the language of Mr. Pugh, defendant's general manager,—

" ' We can see no good reason now for changing the present status of affairs, and we think it wiser that we should continue in charge of its maintenance as we are at present doing.'

" This view of the matter Mr. McLeod refused to adopt.

" Similar correspondence subsequently followed, the plaintiff insisting upon a resumption of control under the agreement and the defendant declining to resign it. And finally an attempt to enforce its claims by taking possession of the tracks was made by the plaintiff and resisted by the defendant. Whereupon on May 17 and 22, 1889, letters were written to the mayor of the city of Philadelphia by each of the parties asking for his interference for the preservation of good order,—requests which were favorably acted upon, the mayor placing in charge of the maintenance of the property an officer belonging to the Department of Public Safety, who has since remained and is now in control.

" There is nothing in this correspondence or the conduct of the plaintiff to prove an agreement or intention on the part of the plaintiff to relinquish the right of maintenance of the railroad secured to it by the contract of May 1, 1882. On the contrary, they plainly show that while it was the desire of the defendant to assume and retain control to the exclusion of the plaintiff, the latter positively refused to surrender it.

" There is no evidence to sustain the averments of the answer as to hostility on the part of the plaintiff towards the

defendant, nor was it attempted to prove that that portion of the contract, Exhibit D, which provided for a division of the cost of maintenance in proportion to the quantity of traffic furnished respectively by plaintiff and defendant, worked inequitably. The defendant rested its case altogether upon the alleged modification of the said agreement.

" In conclusion I respectfully report:

" That the plaintiff is entitled to participate in the control of maintenance of the property with the defendant as in agreement of May 1, 1882, Exhibit D, stipulated.

" And I recommend that the relief prayed for in the bill of complaint be granted, and that a decree be entered for plaintiff, a form whereof is respectfully submitted."

Exceptions to the master's report were dismissed by the court, and the following decree entered:

" And now, Oct. 20, 1894, this cause coming on to be heard upon exceptions on behalf of the defendant to the report of the master, it is ordered, adjudged, and decreed:

" 1. That the defendant keep, observe, and perform all the terms, covenants, and conditions of the agreement of May 1, 1882, and especially that it keep and observe the covenant of said agreement authorizing the plaintiff in each alternate year to take charge of the maintenance of the line of railroad described in the bill in equity in this suit.

" 2. That the year commencing May 1, 1895, is the alternate year within which, according to the said agreement, the plaintiff is entitled to take charge of the maintenance of the said railroad.

" 3. That a perpetual injunction be granted, enjoining the defendant, its officers, agents, and servants, from obstructing or interfering with the plaintiff, its officers, agents, and servants, from taking charge of the maintenance of the said line of railroad during the year commencing May 1, 1895, and during each alternate year thereafter, as provided in said agreement.

" 4. That the costs of this suit be paid by defendant."

*Error assigned* was above decree.

*David W. Sellers*, for appellant, cited: Canal Co. v. Bonham, 9 W. & S. 28; Youngman v. R. R. Co.. 65 Pa. 286; Pennsylvania R. R. Co.'s App., 80 Pa. 265.

*Thomas Hart, Jr.*, for appellee, cited: Bond v. Hilton, Busb., (N. Car.) 308; Curtis v. Swearingen, 1 Ill. (Breese) 207; Kidder v. Rixford, 16 Ver. 169; Western R. R. Co.'s App., 99 Pa. 155; McAboy's App., 107 Pa. 548.

PER CURIAM, May 20, 1895:

We are disposed to affirm this decree upon the record as it is now presented to us. In doing so we think it just to the parties that we state our view of the relations they occupy to each other.

First: The rules adopted by the joint action of the officers of these companies for the management and maintenance of that part of the River Front Railroad that is the subject of this contention amount to an agreement or contract upon the subjects to which they relate.

Second: Such contract is not irrevocable but is subject to such modification as circumstances may require in order to promote the purpose in view and the interests of the parties.

Third: Such changes cannot be made arbitrarily at the will of either party, but require the concurrence of both.

Fourth: Either party may give suitable notice of its purpose to withdraw from the arrangement at and after a day named. Thereafter if the parties cannot readjust their relations to each other the courts must make such ad interim orders as shall protect the rights of the parties and secure the preservation and operation of the road.

Finally, in disposing of such a question the relative ownership, tonnage, and other relevant circumstances should be considered.

We have no doubt the parties will be able to give intelligent attention to all such considerations and arrange for the future without the aid of the courts.

The decree is affirmed subject to such qualification as to its conclusiveness as this opinion indicates.