The Cumberland Valley Railroad Company and The Pennsylvania Railroad Company *v.* The Gettysburg & Harrisburg Railway Company, The Philadelphia & Reading Railroad Company, The Hunter's Run & Slate Belt Railroad Company, and J. S. Harris, E. M. Paxson and J. Lowber Welsh, Receivers of the Philadelphia & Reading Railroad Company, Appellants.

| 177 | 519 |
| s197 | 40 |

| 177 | 519 |
| 21 SC | 86 |

| 177 | 519 |
| 223 | 342 |

*Railroads—Traffic contract—Bonds—Railroad connection—Equity—Specific performance.*

The P. R. R. and the C. V. R. R., two railroad companies, entered into a contract with the S. M. R. R. and the G. & H. R. R., two other railroad companies which were not parallel or competing lines, by which the four companies agreed to interchange traffic and cars, sell through tickets for passengers, and issue through bills of lading for freight.    The P. R. R. and the C. V. R. R. also agreed to set apart fifteen per cent of the gross receipts of freight and passenger traffic to and from any points on the four roads, and pay the same to the trustee of a mortgage to secure bonds issued by the G. & H. R. R. to build an extension of its road.    These bonds were payable in thirty years, and to each bond was attached a memorandum of this provision of the agreement.    The bonds were sold at par, and the extension of the G. & H. R. R. subsequently completed.    For nine years the P. R. R. and C. V. R. R. paid to the trustee the fifteen per cent upon the traffic receipts.    About nine years after the date of the contract, the P. & R. R. R. obtained a controlling interest in the stock of the G. & H. R. R., and all of the stock of the S. M. R. R.    The officers and directors were changed, and the two roads were consolidated under the name of the G. & H. Ry.    About the same time the H. R. R. was incorporated to build a railroad parallel and competing with the C. V. R. R.    After the

completion of this road by orders of the general manager of the P. & R. R. R., the traffic arrangements with the C. V. R. R. and the P. R. R. were disregarded, and the traffic contract was practically extinguished. The P. R. R. and the C. V. R. R. filed a bill in equity against the G. & H. Ry., and P. & R. R. R., and the H. R. R. for the specific performance of the traffic contract above referred to. Some of the material portions of the contract were as follows: "Parties of the third and fourth parts (S. M. R. R. and G. & H. R. R.) hereby respectively covenant and agree that they will so far as they lawfully can send to destination all traffic controlled by them via the lines of the parties of the first and second parts. . . . It being the intention that their lines shall be worked as far as possible in harmony with each other. . . . Nothing in this contract shall be so construed as to give the use of the roads and facilities of the parties of the first and second parts hereto to any parties whose interests may be at variance with, or unfriendly to said parties, nor shall the same be used hereunder to divert from the parties of the first and second part traffic properly tributary to the lines controlled by them." *Held*, (1) that as the contract was wholly between connecting railroads, not competing or parallel, it was for the benefit of the public; (2) that under the terms of the contract the court could not assume that it was intended to unlawfully exclude traffic; (3) that as the P. R. R. and the C. V. R. R. were bound to set aside fifteen per cent of the gross receipts to secure the bonds, and as the S. M. R. R., and the G. & H. R. R. had received in large part the consideration for entering into the contract, the contract ought to be enforced specifically; (4) that the consolidation of the S. M. R. R. and the G. & H. R. R. did not change the identity of the corporations nor their contract liability, inasmuch as equity deals with the substance, and not the form, when it seeks to enforce its decrees; (5) that the mere change of name and personnel of the boards of directors was no obstacle to a mandatory writ in aid of a restraining order; (6) that the contract could not be revoked by either party on notice, as it was fixed by its terms to continue for thirty years; (7) that the contract was sufficiently definite in its terms to enable the court to specifically enforce it; (8) that the complainants were entitled to a decree of specific performance.

Argued April 28, 1896. Appeals, Nos. 79, 80, 81 and 82, Jan. T., 1896, by defendants, from decree of C. P. Cumberland Co., May T., 1893, No. 1, on bill in equity. Before GREEN, WILLIAMS, McCOLLUM, DEAN and FELL, JJ. Affirmed.

Bill in equity to specifically enforce a contract.

BIDDLE, P. J., filed an opinion of which the following is a copy except that some matters immaterial to the decision are omitted.

2. The contract, duly executed and delivered by the parties is set forth in the plaintiff's bill, viz:

"This agreement, made this thirtieth day of September, 1882, between the Pennsylvania Railroad Company, of the first part, the Cumberland Valley Railroad Company, of the second part, the South Mountain Railway and Mining Company, of the third part, and the Gettysburg and Harrisburg Railroad Company, of the fourth part;

"Whereas, the party of the first part owns a line of road from Philadelphia to Pittsburg, and the party of the second part a line extending from Harrisburg, on said Pennsylvania Railroad, down the Cumberland Valley;

"And whereas, the party of the third part owns and controls a line of railroad extending from South Mountain Junction, a point on the said Cumberland Valley Railroad near Carlisle, Pennsylvania, to Pine Grove, Pennsylvania, and the party of the fourth part desires to secure the construction of an extension to said road from a point at or near Hunter's Run to the town of Gettysburg, in the State of Pennsylvania, a distance of about twenty-one miles;

"And whereas, for the purpose of procuring a portion of the means necessary to construct and equip said extension, the said Gettysburg and Harrisburg Railroad Company, in pursuance of the power and authority in it duly vested, has resolved to issue and offer for sale its bonds to the amount of two hundred and fifty thousand dollars, bearing date the second day of October, 1882, and payable thirty years from date, bearing interest at six per centum per annum, payable semi-annually, and secured by a first mortgage upon its railway property and franchises, and the parties of the first and second parts are willing to aid the negotiation of the said bonds in the manner hereinafter set forth.

"Now, therefore this agreement witnesseth:—

"First. That in consideration of the covenants to be performed by the other parties hereto, the Pennsylvania Railroad Company hereby agrees that during each year before the maturity of the said bonds, unless the said bonds should be sooner purchased or the application of the fund herein provided cease under the provisions of this contract, and then only until the happening of either of such events, it will set apart, furnishing to the trustee of the mortgage of the fourth part hereto an account thereof, fifteen per centum of the gross sums due or

accruing to it upon all freight and passenger traffic to or from all points on said Gettysburg and Harrisburg Railroad and Philadelphia and Pittsburg, or any point upon its main line between the same.

"Second. In consideration of the like covenants, the Cumberland Valley Railroad Company hereby agrees that during each year before the maturity of said bonds it will also in like manner set apart (as particularly mentioned in the preceding clause), furnishing to the trustee above mentioned an account thereof, fifteen per centum of the gross sums due or accruing to the said company upon all freight and passenger traffic to or from any point upon said Gettysburg and Harrisburg Railroad and State Line, or any point on its main line between those termini.

"Third. It is hereby covenanted that the said sum of fifteen per centum so to be contributed as aforesaid shall be applied annually to the purchase of the bonds aforesaid at their lowest market value, not exceeding par and interest for and on account respectively of the parties contributing the money therefor, the said trustee to give twenty days' public notice, by three insertions in one newspaper in the city of Philadelphia, that it will receive proposals from the holders for the sale of said bonds. All bonds so purchased out of the said fund shall be delivered by the trustee to the parties hereto of the first and second parts respectively, supplying the funds for that purpose, in proportion to the amount supplied by each, who shall be subrogated to the rights of the original holders, and the same shall bear interest in their hands and be held by them with the same rights as pertained or pertain to the bonds outstanding in the hands of other holders.

"Should the said fund not be required in any other year for the purchase of bonds as aforesaid by reason of there being no offers of bonds to the trustee aforesaid, the said fund shall to that extent lapse for such year and become the absolute property of the company agreeing to contribute the same. It being understood, however, that any memorandum which may be placed upon said bonds to show that they are entitled to the benefit of purchase by the fund hereinbefore referred to, shall be so placed on said bonds that it can be detached, and shall be detached by said trustee when they are so purchased and canceled, and said bonds shall not again be entitled to the benefit of the said fund.

" It is further understood and agreed, that in the event of the foreclosure of the mortgage securing the said bonds or the consummation of legal or equitable proceedings under which said Gettysburg and Harrisburg Railroad should be sold, or its ownership changed, the provisions of this contract in regard to the setting aside and application of the said fund for the purchase of said bonds, shall, at the option respectively of the parties of the first and second parts, thereupon cease and determine.

" Fourth. It is hereby covenanted and agreed by the parties hereto, that they will promote and facilitate the interchange of cars and business between their respective roads—that they will issue coupon tickets for passengers and through bills of lading for freight interchanged between the said lines, and that the earnings from joint business exchanged with the Gettysburg and Harrisburg Railroad, shall be apportioned to and between the parties hereto on such a mileage basis as shall be agreed upon between the parties hereto.

" Fifth. The parties of the third and fourth parts hereby respectively covenant and agree that they will, so far as they lawfully can, send to destination all traffic controlled by them, via the lines of the parties of the first and second parts hereto.

" Sixth. It.being the intent of the parties hereto that their lines shall be worked as far as possible in harmony with each other, the Pennsylvania Railroad and the Cumberland Valley Railroad Companies hereby agree that they will, so far as they can consistently with their obligations to other parties, make such arrangements as will promote the development of and interchange of traffic with the other parties hereto, and that they will receive at all points controlled by them, and promptly transport the traffic originating on or to be delivered to the Gettysburg and Harrisburg Railroad and passing over their lines to or towards its destination at as favorable rates as they accord to any competing line or other parties upon like traffic.

" And the said South Mountain Railway and Mining Company and the Gettysburg and Harrisburg Railroad Company agree that they will receive and transport promptly over their lines and upon as favorable terms as they give to any other parties, all traffic tendered to them by the Pennsylvania Railroad Company, or the Cumberland Valley Railroad Company or lines controlled by them and destined to points upon their said lines.

" Seventh. All settlements of accounts between the parties hereto under this agreement, and payments of money relating thereto, shall be made monthly, except as hereinbefore provided.

" Eighth. Nothing in this contract shall be so construed as to give the use of the roads and facilities of the first and second parts hereto to any party whose interests may be at variance with or unfriendly to the said parties, nor shall the same be used hereunder to divert from the parties of the first and second parts traffic properly tributary to the lines controlled by them.

" In case of any difference or dispute arising out of the transactions under this agreement, the same shall be submitted to arbitration. Within thirty days after notice shall have been given by either of the parties hereto to the others, there shall be chosen one arbitrator by the parties of the first and second parts, and one by the parties of the third and fourth parts, and these two shall select a third like disinterested and competent party. The three arbitrators so chosen shall examine into the cause of dispute or difference, and the decision of a majority of them shall be final and binding between the parties hereto upon the matter in question. In case either of the said parties shall fail to appoint a referee within the thirty days aforesaid, then and in that event the referee appointed by the party not in default shall appoint a referee for the defaulting party, and the said two referees so appointed shall select a third, and the three so chosen shall hear and decide such differences, their decision, or that of a majority of them, to be final and conclusive between the parties hereto."

3. The party of the fourth part, the Gettysburg & Harrisburg Railroad Company, in pursuance of that agreement, on the 2d day of October, 1882, executed a mortgage to the Commonwealth Guarantee Trust & Safe Deposit Company, of Harrisburg, Pennsylvania, recorded in recorder's office, Cumberland county, Pennsylvania, Mortgage book Q, page 517, securing the payment of $250,000 of bonds in denominations of $1,000 and $500 respectively, and payable on the 1st of October, 1912, with coupons thereto attached, with interest at the rate of six per cent per annum, payable semiannually. The trustee in said mortgage, in pursuance of the agreement of September 30, 1882, attached to each of the bonds issued under that mortgage, a memorandum of the said contract of Septem-

ber 30, 1882, containing the things to be done by the Pennsylvania Railroad and the Cumberland Valley Railroad under said agreement, and the said memorandum was so attachèd that it could be detached therefrom by said trustee, as provided for in said agreement. Under the said agreement and the memorandum thereof attached to the bonds, secured by said mortgage, the negotiation of said bonds was greatly assisted, and it added to the value of the said bonds so that the same were never sold under par and interest; and the said railroad was completed and put in operation and open for traffic April 21, 1884.

4. Under the said contract of the 30th of September, 1882, the Pennsylvania Railroad Company and the Cumberland Valley Railroad Company, parties of the first and second parts respectively, made returns to the Commonwealth Guarantee Trust & Safe Deposit Company, trustee in the said mortgage of the Gettysburg & Harrisburg railroad of October 2, 1882, annually, of their gross earnings respectively from freight and passenger traffic to and from the said Gettysburg & Harrisburg Railroad over and from the lines of the said railroad companies, and they have made those returns down to and including the 30th of September, 1894; and each year they have each paid over to the said trust company fifteen per cent of said gross earnings, and the said trust company, in pursuance of the provisions of the said agreement, has each year advertised for bonds secured by the said mortgage to be purchased by it for the said railroad companies out of the said fifteen per cent of the gross earnings so returned and paid as aforesaid. And the said trustee purchased for the Pennsylvania Railroad Company in the year 1885, $4,000 of said bonds; in the year 1886, $2,500 of said bonds; in the year 1887, $2,000 of said bonds; in the year of 1888, $4,000 of said bonds; in the year 1889, $4,000 of said bonds; in the year 1890, $2,500 of said bonds, aggregating $19,000. And for the Cumberland Valley Railroad Company, the said trust company purchased in the year 1885, $3,500 of said bonds; in the year 1886, $2,500 of said bonds; in the year 1887, $3,000 of said bonds; in the year 1888, $3,500 of said bonds; in the year 1889, $2,500 of said bonds; in the year 1890, $3,000 of said bonds; aggregating $18,000, for which par and accrued interest was paid by said trust company. For the years 1891, 1892, 1893 and 1894, no bonds were offered to the

said trust company under its advertisement therefor, and the fifteen per cent paid in each of those years by each of the said railroad corporations to the said trust company was returned to the railroad companies in accordance with the provisions of the contract of September 30, 1882. At the time of the purchase by the said trust company of the bonds for the said railroad companies, a memorandum containing an abstract of the provisions of the contract of September 30, 1882, attached to said bonds, was detached by the said trust company so that the said bonds could not be purchased or turned in a second time under the fifteen per cent of the gross earnings set apart by the said railroad corporation and paid over to the said trust company.

5. The undertaking by the Pennsylvania Railroad Company and the Cumberland Valley Railroad Company to make returns of the amount of their gross earnings on freight and passenger traffic to and from the Gettysburg & Harrisburg Railroad Company in setting apart the fifteen per cent thereof for the purchase of the bonds of the said railroad company secured by the said mortgage, and the memorandum of the provision of the contract of September 30, 1882, attached by the trust company to each of said bonds issued under said mortgage, was a valuable consideration passing from the said railroad corporations to the Gettysburg & Harrisburg Railroad Company and to the holders of the bonds under its mortgage, and the said consideration is a continuing one until the maturity of the bonds secured by said mortgage, unless the said bonds should be sooner purchased or the application of the said fund cease under the provisions of said contract, and then only until the happening of either of said events.

6. The Pennsylvania Railroad Company, the Cumberland Valley Railroad Company, the South Mountain Railway & Mining Company, and the Gettysburg & Harrisburg Railroad Company, each complied with the terms and conditions of the contract of September 30, 1882, from the time of the completion and putting in operation of the Gettysburg & Harrisburg Railroad down to June 14, 1891, and since that time the Pennsylvania Railroad Company and the Cumberland Valley Railroad Company have been ready and willing to continue to comply with the terms and conditions thereof.

7. On May 21, 1891, the Philadelphia & Reading Railroad

Company, by A. A. McLeod, its president, entered into a contract with J. C. Fuller and John M. Butler for the purchase of a controlling interest in the capital stock of the Gettysburg & Harrisburg Railroad, and of the entire capital stock of the South Mountain Railway & Mining Company, and at the time of the execution of that contract of purchase, A. A. McLeod, president of the Philadelphia & Reading Railroad Company; and J. C. Fuller, president of the Hunter's Run & Slate Belt Railroad Company, had notice and full knowledge of the provisions of the contract of September 30, 1882, and in that contract of purchase, the Philadelphia & Reading Railroad Company covenanted to guarantee the bonds of the Gettysburg & Harrisburg Railroad Company, secured by the said mortgage to the Commonwealth Guarantee Trust & Safe Deposit Company, to guarantee the payment of certain bonds issued by the South Mountain Railway & Mining Company, and certain other bonds specified in the said contract of purchase; and also covenanted to join in a lease and traffic contract between the South Mountain Railway & Mining Company and Hunter's Run & Slate Belt Railroad Company, by which that portion of the railroad of the South Mountain Railway & Mining Company, extending from Hunter's Run to Pine Grove, about eight miles, should be leased to said Hunter's Run & Slate Belt Railroad for a period of nine hundred and ninety-nine years, and that there should be a traffic contract between the Hunter's Run & Slate Belt Railroad and the leased portion of the railroad of the South Mountain Railway & Mining Company and the Philadelphia & Reading Railroad Company. The said Philadelphia & Reading Railroad Company also, by the said contract of purchase, covenanted for the merger and consolidation of that portion of the South Mountain Railway & Mining Company's Railroad running from Carlisle to Hunter's Run and the Gettysburg & Harrisburg Railroad, running from Hunter's Run to Gettysburg, into one corporation, and that after such merger and consolidation, there should be placed upon the said railway a mortgage in the sum of $565,000 securing bonds specified therein; the payment of which was also to be guaranteed by the Philadelphia & Reading Railroad Company; and $185,000 of those bonds so guaranteed, were to be delivered to the said J. C. Fuller and John M. Butler in full payment for inter alia

a controlling interest in the capital stock of the Gettysburg & Harrisburg Railroad Company, and of all the capital stock of the South Mountain Railway & Mining Company, and they were so delivered to them on November 4, 1891, and receipted for on the said contract of purchase. The remainder of the bonds secured by said mortgage, the Philadelphia & Reading Railroad Company covenanted to set apart for the payment of the then existing liens upon the Gettysburg & Harrisburg Railroad and the South Mountain Railway & Mining Company, and agreed that the Hunter's Run & Slate Belt Railroad Company should be indemnified by it against every claim or incumbrance arising under the existing mortgage and stock upon that part of the road south of Hunter's Run. On October 14, 1891, the board of directors of the Philadelphia & Reading Railroad Company authorized the guarantee by that company of the bonds set forth in the contract of purchase of May 21, 1891.

8. In pursuance of the provisions of the contract of purchase of May 21, 1891, on July 13, 1891, the Hunter's Run & Slate Belt Railroad Company, the South Mountain Railway & Mining Company and the Philadelphia & Reading Railroad Company entered into a lease and traffic contract by which the South Mountain Railway & Mining Company leased to the Hunter's Run & Slate Belt Railroad Company that portion of its railroad extending from Hunter's Run to Pine Grove for a period of nine hundred and ninty-nine years. The Philadelphia & Reading Railroad Company covenanted that during the continuance of that lease, it would not construct, cause to be constructed, or be a party to the construction of any line of railroad between Hunter's Run & Pine Grove, and to indemnify and save harmless the Hunter's Run & Slate Belt Railroad Company against every claim or incumbrance against the leased line arising under the existing mortgage and bond of the South Mountain Railway & Mining Company, the stock of said company, and against every other lien or incumbrance hereafter at any time to be created by the South Mountain Railway & Mining Company or its successors ; and the said Hunter's Run & Slate Belt Railroad Company covenanted, during the continuance of said contract, to send to destination all traffic of every kind and nature so far as it lawfully could by way of the lines of the South Mountain Railway & Mining Company, and its connec-

tions, and the lines of the consolidated company in which the said South Mountain Railway & Mining Company may be merged, and of the lines owned, controlled and operated by the Philadelphia & Reading Railroad Company; and the board of directors of the Philadelphia & Reading Railroad Company on September 9, 1891, approved the execution of the said traffic contract and lease.

9. On July 16, 1891, the Gettysburg & Harrisburg Railroad Company and the South Mountain Railway & Mining Company executed an agreement of merger and consolidation between that portion of the South Mountain Railway & Mining Company, extending from Carlisle to Hunter's Run, and the Gettysburg & Harrisburg Railroad Company, extending from Hunter's Run to Gettysburg, into one corporation, under the name of the Gettysburg & Harrisburg Railway Company, which agreement of consolidation and merger was authorized and approved and directed by the stockholders of the said respective corporations and their boards of directors.

10. On May 22, 1891, the day succeeding the execution of the contract of purchase and sale of the stock of the Gettysburg & Harrisburg Railroad Company and the South Mountain Railway & Mining Company, the respective boards of directors of said corporations met in the city of Philadelphia, and the several members thereof, in turn, resigned, and the vacancies created by their resignations were filled, . . . . by officers and employees of the Philadelphia & Reading Railroad Company, and they have been officers and directors of the Gettysburg & Harrisburg Railway Company from the time of the agreement of merger and consolidation down to the present time, and are so to-day.

11. Prior to June 14, 1891, the trains of the Pennsylvania Railroad Company and the Cumberland Valley Railroad Company, the railroad of the South Mountain Railway & Mining Company, and the Gettysburg & Harrisburg Railroad Company were so run that close connections of certain passenger and freight trains were made between the said railroads so that they were operated practically as one line of railroad, and in harmony with each other; and under the provisions of the contract of September 30, 1882, the Pennsylvania Railroad Company, the Cumberland Valley Railroad Company, the South Mountain

Railway & Mining Company, and the Gettysburg & Harrisburg Railroad Company agreed upon a mileage basis for the division of freight and passenger earnings which was apparently satisfactory to the several corporations, and through bills of lading and through coupon tickets were issued by the respective companies, and the railroads were all operated practically as part of the same railway system. On June 14, 1891, by the order of I. A. Sweigard, general superintendent or general manager of the Philadelphia & Reading Railroad Company, without conference with the Cumberland Valley Railroad Company or the Pennsylvania Railroad Company, or either of them, the running of trains on the Gettysburg & Harrisburg Railroad and the railroad of the South Mountain Railway & Mining Company was so changed that all connections theretofore existing between them and the lines of the Cumberland Valley Railroad and the Pennsylvania Railroad were broken, and so continued.

12. On July 1, 1891, by the order of B. H. Bail, general freight agent of the Philadelphia & Reading Railroad Company, the through billing of freight from and to points on the Gettysburg & Harrisburg Railway to and from points on the Pennsylvania Railroad and the Cumberland Valley Railroad was broken, and re-billing was required at Gettysburg Junction, where the Gettysburg & Harrisburg Railway joined the Cumberland Railroad, and subsequently to that time, the Philadelphia & Reading Railroad Company removed from the ticket offices on the line of the Gettysburg & Harrisburg Railway Company their coupon tickets theretofore used between the line of that railroad and the Cumberland Valley and Pennsylvania Railroads and substituted therefor other tickets. For points on the Pennsylvania Railroad two tickets were issued, one being a ticket to Harrisburg, and the other, called a "feeder," from Harrisburg to the point of destination, whilst for points on the Philadelphia & Reading Railroad a single "local" ticket has been in use. On the 18th day of April, 1892, the general passenger agent of the Philadelphia & Reading Railroad Company refused to fix rates for excursion trains during the coming season, which should be received from the Cumberland Valley Railroad, to be run to and from Gettysburg on the line of the Gettysburg & Harrisburg Railway, preferring to receive and take them from Harrisburg over lines controlled by the Philadelphia & Reading Railroad.

The authorities of the Philadelphia & Reading Railroad Company charged in all cases, including excursions, after July 1, 1891, local rates for each passenger to and from points on line of the Gettysburg & Harrisburg Railway to points on the lines of the Pennsylvania Railroad and the Cumberland Valley Railroad. It adopted, without conference with the Pennsylvania Railroad Company, fixed charges per ton, called "arbitraries," on all merchandise routed to and from points on the line of the Gettysburg & Harrisburg Railway to points on the lines of the Pennsylvania Railroad, also a fixed sum on each ton of anthracite and bituminous coal, coke, and upon all live stock, and has since maintained and collected said fixed charges (see discussion of "mileage basis," post p. 539).

From and after said rates were fixed the business, passenger and freight, interchanged between the Pennsylvania Railroad Company and the Gettysburg & Harrisburg Railway Company . . . . and of the Cumberland Valley Railroad Company from the interchange of freight and passenger traffic to and from the Gettysburg & Harrisburg Railway Company [largely] decreased. . . . The business of the Gettysburg & Harrisburg Railway Company during these years was increased and not decreased, and the agents at stations on the line of the Gettysburg & Harrisburg Railway sent to destination all freight and passenger traffic via the lines of the Philadelphia & Reading Railroad Company whenever such traffic was not otherwise controlled or differently directed.

The said Gettysburg & Harrisburg Railroad, merged into the Gettysburg & Harrisburg Railway, has failed to issue coupon tickets for passengers from Gettysburg and other ticket stations on its line via the Cumberland Valley & Pennsylvania Railroad to stations on the line of the Pennsylvania Railroad, and in a number of instances the agents at the ticket stations have refused to sell tickets to Harrisburg via the Cumberland Valley Railroad. It has failed and refused to issue through bills of lading for freight to be shipped from freight stations on its line to destinations via the lines of the Cumberland Valley and Pennsylvania Railroads, or either of them. It has failed to send to destination all such traffic via the Philadelphia, Harrisburg & Pittsburg Railroad, or the Philadelphia & Reading Railroad, or both. It has failed to furnish some of the agents on its lines

with rates on freight to be shipped from points on its road to destination via the Cumberland Valley and Pennsylvania Railroads, or either of them, but has furnished the same agent with rates for freight via the Philadelphia, Harrisburg & Pittsburg Railroad and the Philadelphia & Reading Railroad. It has not run its passenger trains so as to afford the passenger trains of the Cumberland Valley Railroad close and convenient connections at Gettysburg Junction, which is the point of intersection of the two roads, although the said trains did formerly have such connection, but since June 14, 1891, the passenger trains of the Gettysburg & Harrisburg Railway Company have been run to conform to the time of, and closely connect with, the passenger trains of the Philadelphia, Harrisburg & Pittsburg Railroad Company and the Philadelphia & Reading Railroad Company.

13. The Philadelphia & Reading Railroad Company, in relation to the Gettysburg & Harrisburg Railway Company, simply owns a controlling interest in the capital stock of that company. The Gettysburg & Harrisburg Railway Company is a separate and distinct corporation from the Philadelphia & Reading Railroad Company, and has its own board of directors. It is not under lease to the Philadelphia & Reading Railroad Company and has no operating contract with said company.

14. Prior to the making of the contract of September 30, 1882, the Pennsylvania Railroad Company controlled a line of road extending from Philadelphia to Hanover, a distance of one hundred and eighteen miles. The Hanover Junction, Hanover & Gettysbury Railroad controlled the line of railroad extending from Hanover to Gettysburg, a distance of sixteen miles, which on November 1, 1886, was merged into and became a part of the Western Maryland Railroad. From 1876 the Pennsylvania Railroad had an arrangement for the interchange of freight and passenger traffic to and from Gettysburg with the Hanover Junction, Hanover & Gettysburg Railroad down to November 1, 1886, and thereafter with the Western Maryland Railroad.

15. The application of the Pennsylvania Railroad Company to the Western Maryland Railroad Company for rates on anthracite coal to Gettysburg, Pa., via Hanover, Penn., was made about four weeks after the fixing of an arbitrary rate on such

coal of 75 cents per ton from Gettysburg Junction to Gettysburg when routed via the Cumberland Valley Railroad.

16. Neither the Philadelphia & Reading Railroad Company nor the Hunter's Run & Slate Belt Railroad Company was a party to the agreement of September 30, 1882, or bound by its provisions. . . .

18. Immediately after the acquisition of the stock of the Gettysburg & Harrisburg Railroad Company by the Philadelphia & Reading Railroad Company, the latter, with the consent of the former, went into possession of its railroad, and upon the merger of the Gettysburg & Harrisburg Railroad Company and the South Mountain Railway & Mining Company, taking effect July 30, 1891, the Philadelphia & Reading Railroad Company went into a complete and exclusive possession of the whole line of railroad between Gettysburg Junction near Carlisle, and Gettysburg, and thereafter until February 20, 1893, ran and operated the said railroad, under an arrangement by which the said Philadelphia & Reading Railroad Company received all the income thereof, made all disbursements on account thereof, and accounted to the Gettysburg & Harrisburg Railway Company for the net balance, if any. After June 14, 1891, neither the said Gettysburg & Harrisburg Railroad Company, nor after July 30, 1891, the consolidated company, the Gettysburg & Harrisburg Railway Company, had any operating officials, and did not continue in the possession and use of the said railroad or any part thereof.

19. From and after February 20, 1893, the receivers of the Philadelphia & Reading Railroad Company have been in possession of the railway between Gettysburg Junction and Gettysburg, and have operated the same under the order of the circuit court of the United States for the eastern district of Pennsylvania, made upon said 20th day of February, 1893, in the case of Platt v. The Philadelphia & Reading Railroad Company et al., and they are now in possession of and are operating the same as one of the railroads "owned, leased or operated by the said Philadelphia & Reading Railroad Company." . . .

20. On July 13, 1891, the South Mountain Railway & Mining Company leased to the Hunter's Run & Slate Belt Railroad Company all that part of the railroad of the former extending from Hunter's Run to Pine Grove Furnace, and thereupon the

latter company entered into possession of the said railroad, and from that time to the present has operated the same as the lessee thereof.

21. After the contract of September 30, 1882, and until the Philadelphia & Reading Railroad Company went into possession of the Gettysburg & Harrisburg Railway, the parties to the said agreement had not, by any other agreement between them, permanently fixed the mileage basis upon which it was provided that the earnings from joint business should be apportioned between them. Whatever division of joint earnings existed between said parties previous to 1891 had been made by operating officers only.

22. The line of the railroad between Shippensburg and Harrisburg, which is that of the Philadelphia, Harrisburg & Pittsburg Railroad Company, is leased to and operated by the Philadelphia & Reading Railroad Company. It crosses the Gettysburg & Harrisburg Railway at Carlisle Junction about six miles south of Carlisle, and is a shorter route from Carlisle Junction to Harrisburg than that via Gettysburg Junction and the Cumberland Valley Railroad.

23. The said Philadelphia, Harrisburg & Pittsburg Railroad affords to all persons shipping or receiving goods from or at any point on the Gettysburg & Harrisburg Railway south of Carlisle Junction, and from or at any point on the railroad operated by the Hunter's Run & Slate Belt Railroad Company between Hunter's Run and Pine Grove Furnace, a shorter line of transportation than that via Gettysburg Junction and the Cumberland Valley Railroad.

24. That the Philadelphia, Harrisburg & Pittsburg is a competitive railroad with the Cumberland Valley Railroad; that it was opened to the public after the agreement of September 30, 1882, namely, in May, 1891; that it was thereupon leased to the Philadelphia & Reading Railroad Company, and that said latter company, irrespective of its operation of the Gettysburg & Harrisburg Railway, invaded the territory theretofore exclusively covered as to outlet by the Cumberland Valley Railroad, and solicited and secured by its agent, Dubbs, part of the traffic of said territory via the Philadelphia, Harrisburg & Pittsburg and Philadelphia & Reading Railroads. . . .

26. After the opening of the Philadelphia, Harrisburg &

Pittsburg Railroad and the operation of the Gettysburg & Harrisburg Railway by the Philadelphia & Reading Railroad Company, some of the shippers upon the lines of the Gettysburg & Harrisburg Railway, and upon the railroad between Hunter's Run and Pine Grove, routed the goods shipped by them, and in case of goods shipped to them, directed their consignors to ship such goods, via the Philadelphia, Harrisburg & Pittsburg Railroad and the lines of the Philadelphia & Reading Railroad Company.

27. The evidence does not show that all of the loss of freight traffic to the Cumberland Valley Railroad and the Pennsylvania Railroad, from the Gettysburg & Harrisburg railroad, via Gettysburg Junction, is due to any breach of the agreement of September 30, 1882, but it shows that part of such loss has been caused by the lawful diversion of said business, by the Philadelphia, Harrisburg & Pittsburg and Philadelphia & Reading Railroads, competitors with the said Cumberland Valley and Pennsylvania Railroads.

28. From the time the Philadelphia & Reading Railroad Company operated the Gettysburg & Harrisburg Railway, there were not any agents of the Gettysburg & Harrisburg Railway Company.

29. The evidence does not show that the Hunter's Run & Slate Belt Railroad Company has, from the time of the making of the lease of July 13, 1891, to the present time, sent to destination by way of the Philadelphia, Harrisburg & Pittsburg and the Philadelphia & Reading Railroads, or lines owned, controlled and operated by the latter, any traffic controlled by the Hunter's Run & Slate Belt Railroad Company, originating on the railroad between Hunter's Run and Pine Grove Furnace, which might have been lawfully sent via the Cumberland Valley and the Pennsylvania Railroads.

30. The evidence does not show that the Hunter's Run & Slate Belt Railroad Company from the time of the making of the lease of July 13, 1891, refused or failed to observe and perform, as to the railroad between Hunter's Run and Pine Grove, any of the covenants of the agreement of September 30, 1882, which were made by the South Mountain Railway & Mining Company.

31. The Pennsylvania Railroad Company, in 1891, made an

arrangement with the Western Maryland Railroad Company for the interchange of passenger business to and from Gettysburg via Lancaster, York and Hanover, and thereafter acted under the said agreement—the said agreement being that the Pennsylvania Railroad Company should run through cars and a solid passenger train to and from Gettysburg, so as to make close connection with the main line of the Pennsylvania Railroad at Lancaster.

32. That neither the said Cumberland Valley Railroad Company nor the Pennsylvania Railroad Company did at any time demand arbitration for any alleged breach of the agreement of September 30, 1882, in accordance with the provisions thereof.

### FINDINGS OF LAW.

We affirm the following legal propositions submitted by plaintiffs:

1. The agreement dated September 30, 1882, set forth in full in plaintiffs' bill, is and was a valid contract upon valuable consideration, binding upon all the parties thereto.

2. Said agreement was not revocable upon notice, or at the will of either party, but continued until rescinded by consent or determined by its terms.

3. The plaintiffs have no adequate remedy at law for breach of said agreement. The only adequate remedy is in equity, by specific performance and injunction.

4. That the directors of the Gettysburg & Harrisburg Railway Company suffered their road to be controlled and managed by the Philadelphia & Reading Railroad Company in the manner shown by the evidence, was a justification and excuse to the Pennsylvania Railroad Company in making the arrangement it did with the Western Maryland Railroad Company, in reference to passenger and freight traffic.

5. There is nothing to prevent a decree of specific performance against the Gettysburg & Harrisburg Railway Company by reason of the control and management of said road by the Philadelphia & Reading Railroad Company.

We affirm the following legal propositions submitted by defendants:

6. The bill does not disclose or show any ground for equitable relief against the Philadelphia & Reading Railroad Com-

pany, by reason of its ownership of the majority of the stock of the Gettysburg & Harrisburg Railway Company.

7. The Philadelphia & Reading Railroad Company did not become bound to observe the contract of September 30, 1882, by reason of the payment of the advertising bills of the Commonwealth Guarantee Trust & Safe Deposit Company of Harrisburg, or by reason of the letters of Mr. McLeod of May 27 and June 18, 1891.

8. The provision at the end of the fourth paragraph for an apportionment of the earnings from joint business, " on such a mileage basis as shall be agreed upon between the parties hereto," did not commit the parties in the absence of a subsequent agreement upon that subject, or, in case of an agreement or a practice fixing a mileage basis for the time being, to a continuance thereof beyond the will of the parties.

9. A shipper of goods, which to reach destination has to pass over one or more other connecting lines, may " route " the same by any line he pleases, and the shipping road is bound to observe his directions.

10. Traffic which is " routed " by a shipper in a particular way, for instance, merchandise shipped from Gettysburg and other points on the Gettysburg & Harrisburg railway to Harrisburg, or from Pine Grove and other points on the railroad between that point and Hunter's Run, via Carlisle Junction and the Philadelphia, Harrisburg & Pittsburg Railroad, is not traffic controlled by the Gettysburg & Harrisburg Railway Company and the Hunter's Run & Slate Belt Railroad Company within the terms of the fifth paragraph of the contract of 1882.

### DISCUSSION BY THE COURT.

The bill in this case was filed on the 4th day of March, A. D. 1893, against the three railroad companies which are named as defendants. On March 15, 1893, upon motion of counsel for plaintiffs, the circuit court of the United States, in and for the eastern district of Pennsylvania, made an order granting leave to make the receivers of the Philadelphia & Reading Railroad Company parties defendant in the case, and on May 9, 1893, an amendment to the bill was allowed by this court by adding thereto as parties defendant Edward M. Paxson, Elisha P. Wilbur and Joseph S. Harris, the receivers aforesaid. All of the

defendants were duly served with process and have appeared and made answer to the complaint. An examination of the agreement of September 30, 1882, shows that, in letter as well as in spirit, the covenants therein are jointly made by the parties of the first and second parts and jointly by the parties of the third and fourth parts and there is, therefore, no technical objection to the maintenance of the action in its present form. . . .

The contract of September 30, 1882, is a conscionable one, with mutual covenants, and it in no wise infringes upon the rights of the public. Its whole purpose was to increase the business of the contracting parties in a perfectly legitimate manner. A railroad company has an undoubted right to enter into a just and fair arrangement with a corporation or association of men, whereby its business will be increased, although the effect of the arrangement may be to take business from others. The right of connecting railroad corporations to make contracts for through rates is incident to their powers unless prohibited by their charters : Munhall v. Railroad Co., 92 Pa. 150. In Tonawanda R. R. Co. v. N. Y., L. E. & W. R. R. Co., 42 Hun, 496, a traffic agreement between two railroad companies, by which each covenanted that it would use its influence to promote the interests and business of the other, so far as it could do so with a proper regard for its own interests, was held to be valid. It was there further held that the parties having entered upon and enjoyed the benefits of the contract for a long period of time, it was too late for one of them to assert that the contract was void because it had no power to secure its performance in the manner stipulated in the instrument; neither party could assert such a defense after entering upon and enjoying the benefits of the contract. A court will not refuse to enforce specific performance of a contract between railroad companies because it involves acts of a continuous and perhaps complicated character extending over a long period of years. In Union P. R. R. Co. v. Chicago, R. I. & P. R. Co., 51 Am. & Eng. Railroad Cases, p. 162, the following language is used: "The next objection made to this decree is that this contract is not one of which specific performance can be enforced in equity; that the acts to be performed under it are so numerous and complicated, and their performance is to extend through so long a term of years, that it would be impracticable for any court to supervise and

enforce such performance. The question here presented is no longer open for consideration in the federal courts. It is settled adversely to the appellants by the decision in Joy v. City of St. Louis, 138 U. S. 1." . . . It is a settled rule in equity that the specific performance of a contract will not be decreed, unless its terms are clear and capable of ascertainment from the instrument itself ; so courts of equity will not ordinarily entertain bills for the specific execution of contracts with variations or additions, or new terms to be made or introduced into them by parol : Hammer v. McEldowney, 46 Pa. 334. The proposition is conceded by all parties concerned that where goods have to pass over two or more connecting lines in order to reach their destination, the shipper may designate the route and the shipping road must observe his directions. In the matter of jurisdiction, it is not material to this case that there was no demand for arbitration, under the ninth article of this agreement, before suit brought. The provision in regard to arbitration which is there contained is not adequate to oust the jurisdiction of the courts : Commercial Union Assurance Co. v. Hocking, 115 Pa. 407.

#### MILEAGE BASIS.

We are asked by the plaintiffs to decree that the Gettysburg & Harrisburg Railway Company shall apportion upon a mileage basis the earnings arising from joint business exchanged by it with the lines of plaintiffs, and to adjudge the twenty mile block system to be a proper basis for apportionment. Upon the subject of the division of earnings, the only provision in the agreement is that " the earnings from joint business exchanged with the Gettysburg & Harrisburg Railroad, shall be apportioned to and between the parties hereto on such a mileage basis as shall be agreed upon between the parties hereto."

It will be noticed that this applies only to business exchanged with the party of the fourth part and not to business interchanged among the other three parties, and that it does not fix a definite mileage basis. Prior to July 1, 1891, the earnings arising from joint business were divided on a twenty mile block basis. The testimony in the case is to the effect that this division was inequitable to the Gettysburg & Harrisburg Railroad Company and that said company could not continue to exist under such an arrangement. On June 4, 1891, at a meeting between

the representative freight agents of the Cumberland Valley Railroad Company and the Philadelphia & Reading Railroad Company, a memorandum was made of a proposed division of the earnings from freight traffic exchanged between the former company and the Gettysburg & Harrisburg Railroad Company, on a fifty mile block basis, which proposed division was subsequently declared by the general freight agent of the former company to be satisfactory, and it only went into effect on July 1, 1891. The same through rates were continued in force as previously, the only change being in the method of apportionment between the two companies. An arrangement by which "arbitraries" were charged on business exchanged between the line of the Gettysburg & Harrisburg Railroad Company and on the line of the Pennsylvania Railroad Company also went into effect on the same date. These arbitraries, which were ostensibly "figured on a basis of fifty miles for all points on the Gettysburg & Harrisburg Railroad," in reality constituted charges on the basis of blocks of one hundred miles, and they were intended to give the average charges upon that block system. The division between the Gettysburg & Harrisburg Railway Company and the Philadelphia & Reading Railroad Company was upon the same mileage block basis. Special arbitraries for anthracite coal, etc., were also fixed. The above mentioned rates have continued in force ever since. . . . After a careful consideration of all the facts of the case, we are satisfied that the court would not be justified in adjudging the twenty mile block system to be a proper basis for the apportionment of joint earnings, and further, that there is not anything in the bill taken in connection with the evidence which would warrant a decree of any kind in relation to a mileage basis.

### THE PHILADELPHIA & READING RAILROAD COMPANY.

It was urged on the argument that the bill should be dismissed as to the Philadelphia & Reading Railroad Company for the reason that it does not show any lawful ground for the relief which is prayed for against that company. The fact that, with knowledge of the agreement of September 30, 1882, it secured the ownership of the majority of the shares of the capital stock of the South Mountain Railway & Mining Company and of the Gettysburg & Harrisburg Railroad Company, and

thereby procured the election of boards of directors of both companies favorable to itself, with the intent of securing the business of said companies, clearly does not in itself afford sufficient basis for the injunction asked for.  By the terms of the act of April 23, 1861 (Purd. Dig. p. 1810, pl. 156) it was lawful for the Philadelphia & Reading Railroad Company to purchase and hold the stock of the above mentioned companies, and after it had acquired a majority of the stock it had the same rights in relation thereto that any other purchaser would have had.  A shareholder has a right, at a meeting of shareholders, to vote upon a measure, even though he has a personal interest therein separate from that possessed by others.  In such a meeting each shareholder represents himself and his interests solely, and he in no sense acts as a trustee or representative of others. The law of self interest has at such times very great and proper sway and a shareholder commits no wrong when he votes his stock in favor of a resolution to purchase property from himself: Gamble v. Q. C. W. Co. et al., 123 N. Y. 91.  In N. W. Trans. Co. v. Beatty, L. R. 12 App. Cas. 589, one of the directors of a company, who owned a majority of the capital stock therein, contracted to sell to the company a vessel which he owned, and it was held that at a meeting of the stockholders he had a right to vote his stock in favor of ratifying the contract and concluding the purchase.

An investigation into personal interests of the numerous shareholders voting at a general meeting would obviously be very difficult, if not impossible, and great uncertainty would result if the validity of acts of the majority were made to depend upon such an investigation.  It has, therefore, been held, for reasons of convenience amounting to a practical necessity, that shareholders in a corporation are not disqualified from voting at a general meeting of the company by reason of their individual interests in the result of the vote: Morawetz on Priv. Corp., Sec. 477.

When the proposed action of the majority stockholders, or of a board of directors representing them, is fraudulent or unduly oppressive to the minority holders, the latter may maintain an action to enjoin the contemplated step; but we know of no principle which would sustain the position that a majority stockholder can be held responsible to one not a stockholder, because

he has voted his stock in favor of propositions which are unfavorable to the outsider's interests. But the plaintiffs further state in their bill that the Philadelphia & Reading Railroad Company since it obtained control, in May, 1891, of the lines of the South Mountain Railway & Mining Company and the Gettysburg & Harrisburg Railroad Company, has operated said roads as part of the Philadelphia & Reading system, in such manner as to promote the interchange of business with itself, to the exclusion as far as possible of the plaintiffs' roads and other lines. It is further stated that since the acquisition of control as aforesaid by the Philadelphia & Reading Railroad Company and by reason thereof, the above mentioned parties of the third and fourth parts to the agreement of September 30, 1882, and the company into which they were consolidated in July, 1891, have not kept the covenants and stipulations of the said agreement, although requested to do so. Our 18th finding of fact sets forth in a general way the facts in relation to the operation of the merged lines by the Philadelphia & Reading Railroad Company as follows :

"Immediately after the acquisition of the stock of the Gettysburg & Harrisburg Railroad Company by the Philadelphia & Reading Railroad Company, the latter with the consent of the former, went into possession of its railroad, and upon the merger of the Gettysburg & Harrisburg Railroad Company and the South Mountain Railway & Mining Company, taking effect July 30, 1891, the Philadelphia & Reading Railroad Company went into complete and exclusive possession of the whole line of railroad between Gettysburg Junction, near Carlisle, and Gettysburg, and thereafter until February 20, 1893, ran and operated the said railroad, under an arrangement by which the said Philadelphia & Reading Railroad Company received all the income thereof, made all disbursements on account thereof, and accounted to the Gettysburg & Harrisburg Railway Company for the net balance, if any.

"After June 14, 1891, neither the said Gettysburg & Harrisburg Railroad Company, nor after July 30, 1891, the consolidated company, the Gettysburg & Harrisburg Railway Company, had any operating officials, and did not continue in the possession and use of the said railroad or any part thereof."
The said Gettysburg & Harrisburg Railway Company was not, at

the date the bill was filed, March 4, 1893, in the possession of the railroad between Gettysburg Junction and Gettysburg, and is not now in possession thereof.

There is no prayer in the bill against the Philadelphia & Reading Railroad Company for specific performance, but the only prayer in relation to that company (except prayer 2 which is refused, because immaterial), is that numbered 5 for an injunction to restrain it "from exerting or using the control, obtained by stock ownership, in the said Gettysburg & Harrisburg Railway Company in any wise to the detriment of the rights of the plaintiffs under the said contract of September 30th, 1882." Would the court be justified in granting the injunction prayed for? Under the principles of law above referred to we are of the opinion that the Philadelphia & Reading Railroad Company has a right to use its control obtained by stock ownership in the Gettysburg & Harrisburg Railway Company, in any way that it deems best, so long as the minority stockholders are content, and that the injunction asked for in prayer 5 should not be granted. Any remedy, therefore, which may be granted to the plaintiffs against the Philadelphia & Reading Railroad Company can be allowed only under, and by virtue of, the prayer for general relief. We are also of opinion that the fact that the Philadelphia & Reading Railroad Company has taken actual possession of the lines of the consolidated companies, and conducted their operations exclusively through its own officials, cannot properly be considered to be the result of a control obtained by stock ownership, although without such ownership it would doubtless not have been able to take possession. Therefore if the prayer in the bill were for an injunction restraining the Philadelphia & Reading Railroad Company from holding possession of and operating the Gettysburg & Harrisburg Railway, to the detriment of the rights of the plaintiffs under the contract of September 30, 1882, it would correctly state the only relief against the first named company which under any circumstances the bill would justify; and would present to the court the real problem which is entirely irrespective of stock ownership.

The question then arises whether the court under the prayer for general relief should consider the subject as if the last mentioned special prayer had actually been made, and grant relief

in accordance therewith, if a proper case has been shown both by the bill and proofs to sustain it. In regard to whether the bill has shown a sufficient case, it will be noticed that whilst it does not contain an express averment that the Philadelphia & Reading Railroad Company has taken possession of the lines of the Gettysburg & Harrisburg Railway Company, yet it does contain the averment that the lines of the latter company "have been operated" by the former, as part of the Philadelphia & Reading system.

This expression is a general one, and is entirely consistent with the facts which appear in the eighteenth finding, and its signification is sufficiently broad to warrant the implication that it was intended to cover all of said facts as well as any others of a similar character which might appear in detail in evidence. A general charge or statement of the matter of fact is sufficient, and it is not necessary to charge minutely all the circumstances which may conduce to prove the general charge; for these circumstances are properly matters of evidence which need not be charged to let them in as proofs: Story's Eq. Pl. sec. 28.

The rules of practice on the subject of special relief are thus stated: The usual course is for the plaintiff to make a special prayer for the particular relief to which he thinks himself entitled, and then to conclude with a prayer for general relief at the discretion of the court. The latter can never be properly and safely omitted; because if the plaintiff should mistake the relief, to which he is entitled in his special prayer, the court may yet afford him the relief, to which he has a right, under the prayer for general relief, provided it is such relief as is agreeable to the case made by the bill: Story's Eq. Pl. sec. 40; Slemmer's Appeal, 58 Pa. 155. Although the special relief asked may not be allowed, yet the court will, if possible, grant such relief as the allegations will support, in order to meet the demands of justice between the parties; so where a bill asking for an assignment of a mortgage was not allowed, yet the court, upon certain averments in the bill, sustained it as a bill to redeem; 6 Am. & Eng. Ency. of Law, p. 764. It is well settled, as a general principle, that where a court of equity has obtained jurisdiction for one purpose it may retain it generally for relief: Allison and Evans' Appeal, 77 Pa. 221. We are satisfied that, in the present action, although the prayer for special relief by

injunction is defective, suitable relief may be granted under the general prayer, in accordance with the equities of the case, both against the Philadelphia & Reading Railroad Company and its receivers, notwithstanding there was no special prayer against the latter. It seemed to be conceded at the argument, though not distinctly admitted, that the fact that the receivers had been made parties defendant by leave of the court which appointed them, made them amenable to the decree of this court in all respects as fully as the other parties. If the practice in the United States courts should prove to be otherwise, the plaintiff should apply to the court which appointed the receivers for leave to have the subjoined decree against them carried into effect.

We have found as a fact that the contract of May 21, 1891, was executed by A. A. McLeod, president of the Philadelphia & Reading Railroad Company, with notice and full knowledge of the provisions of the agreement of September 30, 1882. This was notice to the company which he represented, upon the familiar doctrine that a principal is charged with notice of every fact coming to the knowledge of his agent, which is connected with the business in which the agent is employed. It was he who negotiated for the purchase of a controlling interest in the capital stock of the parties of the third and fourth parts to the agreement of September 20, 1882, and it was he who affixed the name of the Philadelphia & Reading Railroad Company to the contract of purchase. Notice to him of any fact relating to the business which was being transacted was clearly notice to the company of which he was both president and agent. We determine in a later part of this opinion that a lessee of a portion of the road of the South Mountain Railway & Mining Company, with notice of the agreement of September 30, 1882, is bound to observe the terms thereof. A fortiori, the Philadelphia & Reading Railroad Company is bound to observe its terms.

THE HUNTER'S RUN & SLATE BELT RAILROAD COMPANY.

The position is taken on behalf of the Hunter's Run & Slate Belt Railroad Company that there is no obligation on its part to observe the terms and provisions of the agreement of September 30, 1882. Said company is the lessee of that portion of the

line of the South Mountain Railway & Mining Company which extends from Hunter's Run to Pine Grove, a distance of about eight miles. J. C. Fuller, the president of the lessee corporation, testified that prior to and at the time of the execution of the contract of May 21, 1891, for the sale of stock, both he and the said corporation had notice of the agreement of September 30, 1882. Under these circumstances the lessee became bound to carry out the terms of said agreement so far as they appertained to the portion of the road leased. The law upon this subject seems now to be settled. In Joy v. St. Louis, 138 U. S. 1, it was held that the covenants in a tripartite agreement between the commissioners of a park and two railroad companies, as to the use by other railroad companies of a right of way which was granted to the contracting companies through the park, were binding upon subsequent purchasers from one of the railroad companies, with notice. A large number of cases in support of the proposition are cited in the opinion of the court on page 34. Valid contracts made by a corporation survive even its dissolution by voluntary surrender or sale of its franchises: Railroad Co. v. Howard, 7 Wall. 392.

The general rule is thus stated in 19 Am. & Eng. Ency. of Law, 897 : upon the execution of the lease, the lessee becomes bound by all the prohibitions and limitations contained in the charter of the lessor and assumes its rights, franchises and obligations.

The evidence in the case has failed to show any violation by the Hunter's Run & Slate Belt Railroad Company as to the leased road between Hunter's Run and Pine Grove, of the covenants of the agreement of September 30, 1882, and for that reason the prayer for an injunction against it is refused. Yet as said company, by the contract of July 20, 1891, has covenanted for the period of nine hundred and ninety-nine years to send to destination, so far as it lawfully may, all traffic of every kind, by way of the lines of the consolidated company, and of the lines owned and controlled or operated by the Philadelphia & Reading Railroad Company, it is proper that there should be a decree against it for specific performance as to business interchanged between the roads of plaintiffs and the eight miles of leased road.

Section 7 of prayer 3 of the bill is for a decree that the

Gettysburg & Harrisburg Railway Company shall run its passenger trains so as to afford the passenger trains of the Cumberland Valley Railroad Company close and convenient connections at Gettysburg Junction, the point of intersection. There is no provision in the agreement of September 30, 1882, that its passenger trains shall be so run, and the decree asked for would have no better basis than an implication from the general covenants in said agreement in relation to promoting and facilitating the interchange of cars and business between the respective roads of the parties thereto. With how many passenger trains of the Cumberland Valley Railroad Company should close connections be made, and with which particular trains? The court has no light upon this subject, either in the agreement, the bill, or the evidence. The decree, if granted, would offend against the rule that a contract to be specifically enforced must be certain and definite in its terms, and against another rule, which is a deduction from the above, that equity may enforce agreements but may not make them. The decree is therefore refused. •

Section 8 of prayer 3 is for a decree that the Gettysburg & Harrisburg Railway Company shall operate its road exclusively in connection with the roads of plaintiffs, except as to shipments specifically routed or destined to points not reasonably accessible by said lines. We do not find any covenant in the agreement of September 30, 1882, which either expressly or by implication binds the parties of the third and fourth parts to so operate their roads, and the decree asked for is therefore refused. Section 9 of prayer 3 is also refused, for the reason that there is no evidence of the solicitation and exertion therein referred to. In accordance with the views hereinbefore expressed, we enter the appended decree.

DECREE.

And now June 26, 1895, the court does order and decree that the Gettysburg & Harrisburg Railway Company shall observe and perform those covenants in the agreement between the Pennsylvania Railroad Company, the Cumberland Valley Railroad Company, the South Mountain Railway & Mining Company and the Gettysburg & Harrisburg Railroad Company, dated September 30, 1882, and recited in paragraph 2 of the

bill, which are to be performed by the third and fourth parties thereto, especially in the following matters, as to the performance of which we adjudge that breaches have been shown.

Wherefore it is ordered and decreed that the Gettysburg & Harrisburg Railway Company shall do and perform as follows:

First. It shall issue coupon tickets to passengers who shall travel from its line via the Cumberland Valley Railroad and the Pennsylvania Railroad, or either of them.

Second. It shall issue through bills of lading for freight which is shipped from its line via the Cumberland Valley Railroad and the Pennsylvania Railroad, or either of them.

Third. It shall send to destination all traffic controlled by it, via the Cumberland Valley Railroad and the Pennsylvania Railroad, except traffic destined to points not reasonably accessible by those lines.

Fourth. It shall receive and transport over its line, upon as favorable terms as it gives to any other railroad, all traffic interchanged by it with the Pennsylvania Railroad Company and the Cumberland Valley Railroad Company, or either of them.

Fifth. It shall furnish its agents with rates on freight via the Cumberland Valley Railroad and the Pennsylvania Railroad, and shall not charge local rates to Carlisle on shipments routed via the Cumberland Valley Railroad so long as such rates are not charged to all other lines.

Sixth. The court does further adjudge and decree that the Hunter's Run & Slate Belt Railroad Company henceforth treat clause 5 (which is recited in the bill) of the lease and traffic contract of July 13, 1891, as inoperative, null and void in so far as it conflicts with the rights of the plaintiffs, under the agreement of September 30, 1882, and that it specifically perform the covenants of said agreement which are to be performed by the party of the third part thereto, as to business interchanged between the roads of plaintiffs and the leased road extending from Hunter's Run to Pine Grove.

Seventh. The Philadelphia & Reading Railroad Company and Edward M. Paxson, Elisha P. Wilbur and Joseph S. Harris, receivers of said railroad company, their directors, officers and agents, are hereby perpetually restrained and enjoined from holding possession of and operating the road of the Gettysburg & Harrisburg Railway Company in any wise to the detriment

of the rights of the plaintiffs under the said agreement of September 30, 1882.

Eighth. It is ordered that the costs in this action be paid equally by the Gettysburg & Harrisburg Railway Company and the Philadelphia & Reading Railroad Company, or the receivers thereof.

*Errors assigned* were in overruling exceptions to the report of the trial judge.

*J. W. Wetzell* and *Thomas Hart, Jr.*, with them *S. S. Neely*, for appellant.—The contract was invalid because it was unlimited in duration: Chattanooga R. R. v. Cin. R. R., 44 Fed. Rep. 456; Vicksburg Co. v. U. S. Express, 68 Miss. 149; Boston & Lowell R. R. v. Boston & Maine R. R., 5 Cush. 375; Harper v. Hassard, 113 Mass. 187; P. & R. R. v. River Front R. R., 168 Pa. 357. It is exclusive in its character and therefore invalid as against public policy: Munhall v. Pa. R. R., 92 Pa. 150; Hoover v. Pa. R. R., 156 Pa. 220; Sandford v. R. R., 24 Pa. 378; Keeler v. Taylor, 53 Pa. 467; Cumberland Valley R. R. Co.'s App., 62 Pa. 218; Morris Run Coal Co. v. Coal Co., 68 Pa. 173; O. C. & A. V. R. R. v. Pa. Trans. Co., 83 Pa. 160; R. R. v. Lippincott, 86 Pa. 468; U. S. v. Trans. Missouri Assn., 51 Am. & Eng. R. R. Cases, 458.

The enforcement of the contract must be practicable—it must not be impossible of execution: Bispham's Eq. (1893) sec. 377, p. 494; Snell v. Mitchell, 65 Me. 48; Swepson v. Johnston, 84 N. C. 449; Woodward v. Harris, 2 Barb. 439; Smith v. Kelly, 56 Me. 64; Denton v. Stewart, 1 Cox (Eng. Chanc.), 258; Sewall v. Webster, 29 L. J. Ch. 73; Pomeroy, Spec. Perf. of Contracts, sec. 294; Kennedy v. Hazleton, 128 U. S. 671; Patterson v. Martz, 8 Watts, 374; Maguire v. Heraty, 163 Pa. 381; Pullman Palace Car Co. v. Tex. & P. R. R. Rd., 4 Wood's C. Ct. 317; Pa. R. R. v. Sellers, 127 Pa. 406; nor where it is vague and uncertain: Pomeroy, Spec. Perf. of Contracts, sec. 307; 22 Am. & Eng. Ency. of Law, 1012; Wistar's App., 80 Pa. 484; Fry on Spec. Perf. part III. ch. XVI; Merchants' Tradg. Co. v. Bonner, L. R. 12 Eq. 23; Hammer v. McEldowney, 46 Pa. 334; Ballou v. March, 133 Pa. 64; Van Horn v. Munnell, 145 Pa. 497. As a rule, whenever the equity of the party

under the contract is not clear, or his case is unconscionable or inequitable, courts of equity refuse specific performance and leave the party to his action at law: Pennock v. Freeman, 1 Watts, 401; Oil Creek R. R. v. A. & Gt. Western R. R., 57 Pa. 65; Weise's App., 72 Pa. 351; 3 Pom. Eq. Jur. sec. 1405. Also where it is wanting in mutuality as in this case. The parties of the third and fourth parts could not have compelled the others to apply the fifteen per cent of the joint receipts to the purchase of bonds: Bodine v. Glading, 21 Pa. 50; Meason v. Kaine, 63 Pa. 335; Philips v. Min. & M. Co., 7 Phila. 619; Sunb. & E. R. R. v. Cooper, 33 Pa. 278; Foll's App., 91 Pa. 434. The complainants have an adequate remedy at law: Pomeroy, Spec. Perf. of Contracts, sec. 47; Koch's App., 93 Pa. 434; Terre Haute & Ind. Ry. Co. v. Struble, 109 U. S. 381.

The public has an interest in the nonperformance of the agreement: R. R. Co. v. Lippincott, 86 Pa. 468.

The decree asked for in this case involves continuous and complicated acts extending (if the contract be not at will) over an indefinite time, including the conduct of the business of the Gettysburg & Harrisburg Railway. Equity will not undertake such a task: Beach, Eq. Juris, sec. 596; 2 Morawetz, sec. 1134; Fry on Spec. Perf. (1892) sec. 99; Pomeroy, Spec. Perf. of Contracts, sec. 312; 1 Wood's Ry. Law, sec. 210; Ross v. Ry., 1 Woolw. 26; Blackett v. Bates, L. R. 1 Ch. App. 117; Powell D. S. Coal Co. v. Ry. Co., L. R. 9 Ch. App. 331; Marble Co. v. Ripley, 10 Wall. 339; Tex. & P. R. R. v. Marshall, 136 U. S. 393; Pt. Clinton R. R. v. C. & T. R. R., 13 Ohio, 544; Pullman Palace Car Co. v. T. & P. C. Rd. Co., 11 Fed. Rep. 625; Blanchard v. Detroit, etc., C. R. Rd., 31 Mich. 43; St. Thomas, etc., Ry. v. C. V. R. R., 7 Ont. 332; Wolverhampton, etc., R. R. v. L. & N. W. L. R., 16 Eq. 433; Johnson v. S. & B. Ry., 3 De G. M. & G. 914; Gt. No. Ry. v. M. S. & L. S. Ry., 5 De G. & S. 138; P. R. R. Co. v. St. Louis R. Co., 118 U. S. 290; Union Pac. R. v. Chicago Ry., 51 Am. & Eng. R. R. Cases, 163; also reported in 10 U. S. App. 98.

A plaintiff cannot under a general prayer ask for a decree different from that prayed for: D. & H. Canal Co., v. Pa. C. Co., 21 Pa. 131; Cumberland Valley R. R. Co.'s App., 62 Pa. 218; Passayunk B. Assn., 83 Pa. 441. It is too late to amend after bill, answer, replication, reference to master and examina-

tion of witnesses : Dougherty v. Murphy, 1 Leg. Chr. Rep. 280 ; Toomey v. Hughes, 25 W. N. C. 66 ; Brotzman's App., 119 Pa. 651.

A majority of stockholders cannot control the directors or interfere with their management of the business of the company : 1 Morawetz on Corp. sec. 475 ; 23 Am. & Eng. Ency of Law, 851 ; Smith v. Hurd., 12 Metc. 385 ; St. Mary's Church Case, 6 S. & R. 508 ; Dana v. Bank, 5 W. & S. 223 ; Edison v. Phonograph Co., 47 Am. & Eng. Corp. Cas. 413.

Individual stockholders are not the proper parties to sue or defend on behalf of corporate interests : Taylor on Corporations, sec. 138 ; Silk Mfg. Co. v. Campbell, 27 N. J. L. 539 ; Blackman v. Central R. R., 58 Ga. 189 ; Bronson v. La Crosse R. R., 2 Wall. 283 ; Cooch v. Goodman, 2 Gale & D. 159 ; Waterman on Corp. sec. 319 ; Hawes v. Oakland, 104 U. S. 450 ; Detroit v. Dean, 106 U. S. 537 ; Gravenstine's App., 49 Pa. 310 ; Watt's App., 78 Pa. 370 ; So. West Nat. Gas Co. v. Fayette Fuel Gas Co., 29 W. N. C. 247 ; 1 Morawetz on Corporations, sec. 271 ; 2 Morawetz on Corporations, sec. 779.

Interest in a subject does not disqualify a stockholder from voting thereupon : 1 Morawetz on Corporations, sec. 477 ; 23 Am. & Eng. Ency. of Law, 852 ; Gamble v. Queens County Water Co., 123 N. Y. 91 ; also reported in 31 Am. & Eng. Corp. Cas., S. C. 313 ; Mining Co. v. Merryweather, 2 H. & M. 254 ; N. W. Trans. Co. v. Beatty, L. R. 12 App. Cases, 589 ; Pender v. Lushington, L. R. 6 Chan. Div. 70 ; Menier v. Telegraph Works, L. R. 9 Ch. 350 ; C. & A. R. R. v. Elkins, 37 N. J. Eq. 274 ; McCune v. Gas Co., 30 Conn. 521 ; Occum Co. v. Sprague Mfg. Co., 34 Conn. 530 ; Jenkins v. Fowler, 24 Pa. 308.

The Philadelphia & Reading Railroad Company is not bound by the agreement of 1882 by reason of any privity of estate, by reason of its possession and operation of the Gettysburg & Harrisburg railway : Mason v. Rogers, 109 Pa. 319 ; Spencer's Case, 5 Coke, 16 ; 1 Smith's L. C. 174 ; 4 Am. & Eng. Ency of Law, 498 ; Amer. Notes to Spencer's Case, 1 Smith's L. C. 217 ; Shep. Touch. ch. 7, p. 161 ; Platt on Covenants, 60–62 ; 19 Am. & Eng. Ency. of Law, 1000 ; Tulk v. Moxhay, 2 Phillips, 774 ; Cooke v. Chilcott, L. R. 3 Ch. Div. 694 ; L. & S. W. Ry. v. Gomm, L. R. 20 Ch. Div. 562 ; Frye v. Partridge, 82 Ill. 267 ;

Gibert v. Peteler, 38 Barb. 488; Clark v. Martin, 49 Pa. 289; St. Andrew's Church's App., 67 Pa. 512; Le Neve v. Le Neve, 2 White & Tudor's Leading Cases in Eq. 35; 1 Beach Eq. Juris. sec. 346.

Where the relation of landlord and tenant is created and a burden is put by the lease upon the land leased, an assignee of the term will take subject to the burden: R. R. v. Howard, 7 Wall. 392; 19 Am. & Eng. Ency. of Law, 897, 1002, 1004; Pa. R. R. C. v. Sly, 65 Pa. 205; Keppell v. Bailey, 2 Myl. & K. 517; Spencer's Case, 1 Smith's L. C. 191; Hare & Wallace's Notes to Spencer's Case, 1 Smith Lead. Cases, 178; W. Va. Transp. Co. v. Ohio River Pipe Line Co., 22 W. Va. 626; Kettle River R. R. v. Easton R. R., 41 Minn. 461; Norcross v. James, 140 Mass. 193; Wiggins Ferry Co. v. O. & M. Ry. Co., 94 Ill. 83; Flight v. Glossopp, 2 Bing. N. C. 125; Grubb's App., 66 Pa. 117.

*Edward B. Watts, John Hays* and *D. Watson Rowe,* for appellees.—The defendants occupy the strange position of refusing to fulfill the only covenant in the agreement valuable to the plaintiffs at the same time that they are holding the plaintiffs to the contract, and have received all the benefit of it for nine years up to this time. Under such circumstances the court will not lend a willing ear to such objections as want of consideration, want of certainty, want of mutuality, against the policy of the law, etc.: Fry on Spec. Perf. of Cont. (3d London ed.) sec. 335; Union Pac. R. R. v. McAlpine, 129 U. S. 305.

The traffic "controlled" by a transportion company is such only as is not specially routed by the shipper. The shipper's directions as to route must be followed: Schouler's Bailments & Carriers (2d. ed.) sec. 403; Wiggins Ferry Co. v. Chicago, etc., 5 Am. & Eng. R. R. Cases, 1, 20, 21. As to shipments not specially routed, the receiving carrier is free to select the line. An agreement to send such traffic by a particular line cannot either "tend to monopoly" or "to increase rates," or "to prevent competition," because of the shipper's right to designate the route, where the agreement provides for the carriage at fair rates: Tonawanda etc. R. R. v. New York etc. R. R., 42 Hun, 496; 52 Am. & Eng. R. R. Cases, 82. Moreover, the obligation of a common carrier extends only to carry to the

end of his own route and deliver there to next carrier: Camden
v. Forsyth, 61 Pa. 81.   But through bills bind for safe delivery
at agreed point of destination and make carrier responsible for
any default or neglect on any part of the route : Coles v. Cent.
R. R., 45 Am. & Eng. R. R. Cases, 328; Tozer v. U. S., 53 Am.
& Eng. R. R. Cases, 14; Osborne's Case, 53 Am. & Eng. R. R.
Cases, 18; Little Rock etc. v. St. Louis, 42 Am. & Eng. R. R.
Cases, 490 ; Int. State C. C. v. Cinn. R. R., 54 Am. & Eng. 366.

The contract fixes a time for its duration: Bald Eagle Val-
ley R. R. Co.'s Case, 171 Pa. 284; P. & R. R. R. v. River
Front, 168 Pa. 357; Appeal of Cornwall and Lebanon Ry. Co.,
125 Pa. 232, Elkins v. Camden etc. R. R., 36 N. J. Eq. 241.

The court will perform piecemeal where the contract, though
entire in itself, contemplates a separate and piecemeal perform-
ance : Fry on Spec. Perf. of Contract, sec. 370 ; Bald Eagle
Val. R. R. Co.'s Case, 171 Pa. 284; Appeal of Cornwall and
Lebanon Ry. 125 Pa. 232.

The contract is not wanting in mutuality : Sunbury etc. Co.
v. Cooper, 33 Pa. 278; Foll's App., 91 Pa. 434; Eckstein v.
Downing, 64 N. H. 248; Bacon v. Kentucky C. R., 95 Ky. 373;
Hepworth v. Henshall, 153 Pa. 592; Fry on Spec. Perf. of
Contract, sec. 863.

The contract may be specifically enforced: Louisville etc.
R. R. v. Miss. R. Co., 92 Tenn. 681; 59 Am. & Eng. R. R.
Cases, 99; Union Pac. v. Chicago etc. Ry., (U. S. C. C. of
App.) 51 Fed. Rep. 309 ; 51 Am. & Eng. R. R. Cases, 162;
Wolvehampton etc. R. R. v. London etc. R. R., L. R. 16 Eq.
Cases 433 ; Southern Express Co. v. St. Louis etc. Ry. Co., 10
Fed. Rep. 210; Chicago & A. v. New York etc. Ry., 22 Am.
& Eng. R. R. Cases 265 ; De Mattos v. Gilson, 4 De G. & J. 276;
P. R. R. v. St. Louis R. R., 118 U. S. 290; Cornwall etc. Co.'s
App., 125 Pa. 232; Rome, Watertown etc. Ry. v. Ontario
Southern Ry. Co., 16 Hun, 445; Pullman Palace Car Co. v.
Missouri Pac. Ry. Co., 115 U. S. 587; Central R. & B. Co. v.
Farmers Loan & T. Co., 56 Fed. Rep. 357 ; 60 Am. & Eng.
R. R. Cases, 442.

Our contention is that the P. & R. R. R. is bound because it
purchased the stock and operated the road with knowledge of
the agreement, took the benefits of it and adopted it ; that it is
not necessary it should have agreed to be bound by the terms

of the contract, if, with knowledge of it, it entered into such relations with the plaintiffs as are only consistent with the adoption of the contract. The authorities in support of this position are these : Fry on Spec. Perf. of Contract, sec. 241 ; Joy v. City of St. Louis, 138 U. S. 1 ; 45 Am. & Eng. R. R. Cases, 655 ; 1 Spelling Extraordinary Relief, 379 ; Tulk v. Moxhay, 2 Phila. 774 ; Pearson v. Concord R. R., 13 Am. & Eng. R. R. Cases. 102.

Further, the Philadelphia & Reading Company must be considered to have adopted the contract and should be enjoined on principles of justice : Wiggins Ferry Co. Case, 142 U. S. 396 ; 52 Am. & Eng. R. R. Cases, 82 ; Easton v. Houston, etc. Ry. Co., 38 Fed. Rep. 784.

The agreement of September 30, 1882, was one which the four companies, parties thereto, had power to make : 1 Morawetz on Priv. Corp. sec. 336 ; 1 Wood on Railroads, 2d ed. 593 ; 1 Redfield on Ry., 6th ed. 658 ; Act of March 17, 1869, P. L. 11 ; Oil Creek Co. v. Pa. Trans. Co., 83 Pa. 160 ; Tonawanda, etc. Ry. Co. v. N. Y. etc. R. R., 42 Hun, 496.

The agreement is not void as against public policy : Schouler's Bailments and Carriers, sec. 403 ; Wiggins Ferry Co. v. Chicago & Alton R. R., 73 Mo. 389 ; Snow v. Indiana, etc. R. R., 28 Am. & Eng. R. R. Cases, 77 ; Phila. R. R. Co. v. Beck, 125 Pa. 620 ; s. c., 52 Am. & Eng. R. R. Cases, 82 ; Richmond v. Dubuque etc. R. R. Co., 33 Iowa, 422 ; s. c., 26 Iowa, 190 ; Canadian Pacific v. West. Un., 17 Can. S. C. 151 ; Terre Haute Co. v. Struble, 16 Am. & Eng. R. R. Cases, 597 ; Chicago, etc. Ry. Co., v. Pullman Southern Car Co., 139 U. S. 79 ; 47 Am. & Eng. R. R. Cases, 424 ; United States v. Trans. Missouri, 51 Am. & Eng. R. R. Cases, 458, 497 ; Express Co. Cases, 117 U. S. 1 ; Munhall v. Penna. R. R., 92 Pa. 150 ; Elkins v. C. & A. Ry. Co., 36 N. J. Eq. 241 ; Huston etc. R. R. Co. v. Hill, 21 Am. & Eng. R. R. Cases, 263 ; Lotspiech v. Central R. R., 73 Ala. 306 ; Assurance Co. v. Hocking, 115 Pa. 407 ; Insurance Co. v. Morse, 20 Wall. 445 ; Rea's App., 13 W. N. C. 546 ; Mentz v. A. M. F. I. Co., 79 Pa. 478 ; Atchison etc. R. R. v. Denver etc. R. R., 110 U. S. 667 ; Louisville E. & St. L. Ry. Co. v. Wilson, 54 Am. & Eng. R. R. Cases, 452 ; Nicholson v. Great Northern Ry. Co., 5 C. B. 366 ; Camden etc. R. R. Co. v. Forsyth, 61 Pa. 81 ; Little Rock & Memphis Ry. v. St. Louis Iron Mt. & S. Ry. Co., 42 Am. & Eng. R. R. Cases, 490 ; Coles

v. Central R. R., 45 Am. & Eng. R. R. Cases, 328; Tozer v. U. S., 53 Am. & Eng. R. R. Cases, 14; Chicago & N. W. R. R. v. Osborne, 53 Am. & Eng. R. R. Cases, 18; Eclipse Tow Boat Co.'s App., 24 La. An. 1; Interstate C. C. v. Cinn. R. Co., 54 Am. & Eng. R. R. Cases, 366.

Equity can only adjust the nature and extent of the relief to the parties. The only adequate relief is by specific performance and injunction: Penn. R. R. Co. v. St. Louis, Alton & Terre Haute R. Co., 118 U. S. 290, 305; 24 Am. & Eng. R. R. Cases, 58, 67; Redfield on Railways, 6th ed. 29; Lindsay v. Great Northern Ry. Co., 10 Hare, 665; Conger v. N. Y. etc., note, 43 Am. & Eng. R. R. Cases, 651; Union Pac. v. Chicago etc. Ry. Co., 51 Fed. Rep. 309; C. & A. etc. v. N. Y., 24 Fed. Rep. 567.

OPINION BY MR. JUSTICE DEAN, October 5, 1896:

The Pennsylvania and Cumberland Valley Railroads, the first extending east and west and the second south, had for years prior to 1882 maintained a connection at Harrisburg for the interchange of freight and passenger traffic. From Carlisle, a point on the Cumberland Valley Railroad eighteen miles southwest of Harrisburg, the South Mountain Railway & Mining Company operated a railroad for eighteen miles to Pine Grove, in a southeasterly direction; this road had a connection and interchanged traffic with the Cumberland Valley. In 1882, the Gettysburg & Harrisburg Railroad was incorporated to be built from Hunter's Run, a point on the South Mountain Railway about ten miles from Carlisle, to the town of Gettysburg in Adams county, a distance of about twenty-one miles. This last company needed funds to build, and thereupon all four roads named, on 30th of September, 1882, entered into an agreement by which it was covenanted, they would, to promote their mutual interests, interchange traffic and cars on their respective roads; would sell through coupon tickets for passengers; make through bills of lading for freight; and the joint earnings of the business coming from and going over the Harrisburg & Gettysburg road should be apportioned among the respective parties on a mileage basis thereafter to be agreed upon, and the whole connecting system of the four roads should be operated in harmony in the development of traffic; the South Mountain

and Harrisburg and Gettysburg at the same time covenanting they would, so far as they lawfully could, send traffic to destination over the lines of the Cumberland Valley and Pennsylvania Railroads. In consideration thereof, these two last named roads covenanted to set apart fifteen per cent of the gross receipts of freight and passenger traffic to and from any points upon the South Mountain and Gettysburg and Harrisburg roads to and from any points on the Cumberland Valley and Pennsylvania roads, and pay the same to the trustee in a mortgage of $250,000 to secure bonds to be issued on such mortgage on the Gettysburg & Harrisburg Railroad, the bonds to be payable in thirty years with interest at six per cent, the trustee to appropriate the fund thus raised annually in the purchase of the bonds; it was further agreed the trustee should attach to each bond a memorandum of this provision of the agreement. The bonds were soon after all sold at par, and the road completed to Gettysburg in April, 1884. A prosperous business was built up; the Cumberland Valley paid, of the fifteen per cent set apart by it in the purchase of bonds in the first five years after the road was opened, $18,000, and the Pennsylvania, $19,000.

In May, 1891, the Philadelphia & Reading Railroad purchased a controlling interest in the stock of the Gettysburg & Harrisburg road, and all of the stock of the South Mountain, immediately after, the boards of directors in each company were changed, and officers and employees of the Reading were put in their places, and the two roads consolidated under the name of the Gettysburg & Harrisburg Railway Company. About the same time, the Hunter's Run & Slate Belt Railroad was incorporated to build a road from Pine Grove, the southern terminus of the South Mountain, to the slate quarries, a distance of about five miles; then, a traffic contract for the term of nine hundred and ninety-nine years was made between the different companies, and such leases made as were deemed desirable, with the stipulation that all traffic was to be sent to destination by the Reading and lines controlled or operated by its connections. At the date of these contracts, the contract with the Cumberland Valley and Pennsylvania of 30th of September, 1882, was known to all parties. Soon after, by orders of the general manager of the Reading, the connection between trains running on the Cumberland Valley and Pennsylvania was broken,

through billing of freight and the sale of coupon tickets were stopped; the theretofore agreement for apportionment of receipts on a mileage basis was also disregarded; in fact, the business accruing to the Cumberland Valley and Pennsylvania under their traffic contract was practically extinguished, as concerned them. Thereupon these two companies filed this bill setting out these facts and praying: 1. For a decree of specific performance of the contract as against the Gettysburg & Harrisburg Railway Company into which the two contracting roads had been consolidated, and 2. For an injunction against the Philadelphia & Reading Company and its receivers in aid of such decree. The answers filed by defendants really leave nothing in dispute as to the material facts which must control the decree; the right to relief as prayed for is denied.

The court below, after full hearing, decreed as follows:

" And now June 26, 1895, the court does order and decree that the Gettysburg & Harrisburg Railway Company shall observe and perform those covenants in the agreement between the Pennsylvania Railroad Company, the Cumberland Valley Railroad Company, the South Mountain Railway & Mining Company and the Gettysburg & Harrisburg Railroad Company, dated September 30, 1882, and recited in paragraph 2 of the bill, which are to be performed by the third and fourth parties thereto, especially in the following matters, as to the performance of which we adjudge that breaches have been shown.

" Wherefor it is ordered and decreed that the Gettysburg & Harrisburg Railway Company shall do and perform as follows:

" First. It shall issue coupon tickets to passengers who shall travel from its line via the Cumberland Valley Railroad and the Pennsylvania Railroad, or either of them.

" Second. It shall issue through bills of lading for freight which is shipped from its line via the Cumberland Valley Railroad and the Pennsylvania Railroad, or either of them.

" Third. It shall send to destination all traffic controlled by it, via the Cumberland Valley Railroad and the Pennsylvania Railroad, except traffic destined to points not reasonably accessible by those lines.

" Fourth. It shall receive and transport over its line, upon as favorable terms as it gives to any other railroad, all traffic inter-

changed by it with the Pennsylvania Railroad Company and the Cumberland Valley Railroad Company, or either of them.

"Fifth. It shall furnish its agents with rates on freight via the Cumberland Valley Railroad and the Pennsylvania Railroad, and shall not charge local rates to Carlisle on shipments routed via the Cumberland Valley Railroad so long as such rates are not charged to all other lines.

"Sixth. The court does further adjudge and decree that the Hunter's Run & Slate Belt Railroad Company henceforth treat clause 5 (which is recited in the bill) of the lease and traffic contract of July 13, 1891, as inoperative, null and void in so far as it conflicts with the rights of the plaintiffs, under the agreement of September 30, 1882, and that it specifically perform the covenants of said agreement which are to be performed by the party of the third part thereto, as to business interchanged between the roads of plaintiffs and the leased road extending from Hunter's Run to Pine Grove.

"Seventh. The Philadelphia & Reading Railroad Company and Edward M. Paxson, Elisha P. Wilbur and Joseph S. Harris, receivers of said railroad company, their directors, officers and agents, are hereby perpetually restrained and enjoined from holding possession of and operating the road of the Gettysburg & Harrisburg Railway Company in any wise to the detriment of the rights of the plaintiffs under the said agreement of September 30, 1882.

"Eighth. It is ordered that the costs in this action be paid equally by the Gettysburg & Harrisburg Railway Company and the Philadelphia & Reading Railroad Company, or the receivers thereof."

From this decree, both plaintiffs and defendants have appealed. The plaintiffs assign twenty-nine errors to the decree, defendants, thirty-nine. As to those on either side which question the correctness of any finding of facts by the court below, they are dismissed; we discover no manifest error in any of these findings.

We are clear in our conclusion, that the South Mountain & Gettysburg & Harrisburg form in no reasonable view a parallel and competing line to the Cumberland Valley with which they connect; their line approaches Carlisle, the connecting point, almost at right angles; a glance at any railroad map shows this;

from Gettysburg to Carlisle, the traffic along this line, when the contract of September 30, 1882, was made, was not one for which the Cumberland Valley could compete; the only competitors that these two short roads could have had at that date were country wagons on the ordinary highways. The contract was not, therefore, forbidden by the constitution. It was in fact an advantage to the public, as well as to the contracting parties, for it relieved the public of the inconvenience of transfer of goods, rebilling, provided for travelers close connections, and necessarily lessened the actual cost of transportation; and there is no evidence the contract was made with a view to increase charges to the shipper; the profits of the contracting parties were expected to result from a lessening of operating expenses to all of them. Any such contract inevitably tends to the advantage of the public, for the cheaper any product can be delivered at destination, the better able is the producer to meet in the market the same products brought to the same destination by other roads, which last always aim to reach and do reach the points where products are marketable. The contract really tends to accomplish the purpose of the general railroad law of 1868, which provides that railroads of a similar character shall have the right to connect upon such terms as may be agreed upon by those who have the management of such roads; and also of the constitution, which declares they shall have the right to connect, and then avows the purpose, that they may " receive and transport each the other's passengers, tonnage and cars, loaded or empty, without delay or discrimination." We conclude, therefore, the contract was not between parallel and competing roads; nor was it unlawful in its ostensible purpose. Whether any of its provisions are unlawful, or whether because of the indefiniteness of others, it is incapable of specific execution, are altogether different questions, and these we now proceed to notice.

It is alleged by defendants the contract attempts to exclude other railroads from any use of the roads controlled by the contracting parties. This is only inferential; there is nothing in the contract expressive of such intention. The 5th section of the agreement provides that: " The parties of the third and fourth parts (the South Mountain and the Gettysburg & Harrisburg roads) hereby respectively covenant and agree that they will, so far as they lawfully can, send to destination all traffic

controlled by them via the lines of the parties of the first and second parts hereto." Then further, the sixth section: "It being the intention of the parties hereto that their lines shall be worked as far as possible in harmony with each other;" the two stronger roads covenanting that they will, so far as they can consistently with obligations to other parties, promote the development and interchange of traffic, and carry it at as favorable rates as they accord to any others. Up to this point there is nothing even hinting at a course of conduct violative of either the common or statute law. Nor is the eighth obnoxious to the law. It is as follows: "Nothing in this contract shall be so construed as to give the use of the roads and facilities of the parties of the first and second parts hereto (the Cumberland Valley and Pennsylvania) to any parties whose interests may be at variance with or unfriendly to said parties, nor shall the same be used hereunder to divert from the parties of the first and second parts, traffic properly tributary to the lines controlled by them." The object of this provision, it is clear, had no application to circumstances as they existed when the contract was made September 30, 1882. The Philadelphia, Harrisburg & Pittsburg Railroad, running from Shippensburg to Harrisburg and crossing the Gettysburg & Harrisburg road six miles south of Carlisle, was not opened for nearly ten years after the date of this contract; it is leased and controlled by the Philadelphia & Reading, and not only is a parallel and competing road with the Cumberland Valley, but was probably intended to be such by its promoters. This section of the contract had in contemplation, doubtless, the construction of this or any other road to be thereafter built; but its provisions could not legally prevent either the one party or the other, after a connection was established as provided by law, from interchange of traffic, nor could it prevent shippers from routing freight to destination over any lines they selected, no matter what the point of shipment or destination. All that can be said of this section is, it may have contemplated a violation of law; if it did, no such violation is shown, although the contract was in operation for years. As it is capable of a wholly different and lawful interpretation, we cannot assume it was intended to unlawfully exclude traffic.

It seems to us, the argument and the authorities cited to show

the illegality of the contract bear on a state of facts other than those found in this case. If this agreement was intended to give a preference to a certain class of shippers or transporters, and to exclude others, shipping and transporting under like circumstances, it would be void, and Sandford v. Railroad Co., 24 Pa. 378, and like cases would be in point. But it is wholly between connecting roads, not competing or parallel, for interchange of traffic upon terms agreed upon; and they expressly disclaim any intention to violate the law by stipulating to promote their mutual interests so far as they lawfully can.

Before the construction of the Gettysburg & Harrisburg road, plaintiffs agreed to set aside fifteen per cent of certain gross receipts for purchase of the bonds of that road, which had thirty years to run; that at once gave them a value to the investing public, who, it is to be presumed, now hold them; they have thirty years to run; to every one of them, by full authority of plaintiffs, was appended a memorandum of this agreement; the road was constructed from the money thus received; by virtue of this stipulation, already nearly $40,000 has been set aside and appropriated to the purchase of these bonds, and the action of these plaintiffs, having made this part of the contract, in effect, a contract between them and the bondholder, their liability by the contract will continue until the last bond has been paid; that is, nothing the obligor in the bond, the Gettysburg & Harrisburg road, may do in violation of the contract, can relieve plaintiffs from, in substance, their contract with the bondholder to continue to set aside fifteen per cent of the gross receipts for purchase of bonds. The South Mountain and Gettysburg roads having received in large part the consideration for entering into the contract, and the contract not being in violation of law, it ought to be enforced specifically, if it be of such terms as that it is capable of enforcement in equity, and if the parties, as they now stand in relation to each other, can be brought within the jurisdiction of equity, so that the hand of a chancellor will reach them.

First, as to the Gettysburg & Harrisburg Railway, which by the consolidation now stands as the representative of the South Mountain and Gettysburg & Harrisburg Railroad Companies: A controlling interest in the stock of the two merged and consolidated roads was obtained by the Philadelphia & Reading,

which controlled the Philadelphia, Harrisburg & Pittsburg Railroad, a parallel and competing line with the Cumberland Valley, constructed long after the contract. It was manifestly, therefore, to the Reading's interest as the practical owner of a competing line, to break the contract with the plaintiffs. It proceeded to do so without hesitation, acting nominally through the new boards of management in the roads over which it had secured control. But a change of persons in a corporation board of directors does not change the identity of the corporation, nor its contract liability; nor is the obligation of the other party to the contract affected; such change can no more relieve the corporation from its contract liability than from the $250,000 mortgage on its corporate property. What effect the dissolution of the corporation under judicial decree or the sale of its franchise and property under proceedings in bankruptcy would have on unsecured contracts are altogether different questions. Here, the two corporations, at the instance of stockholders having full knowledge of the prior contract, were consolidated under a new name and different management; but for juridical purposes, the new managers and new name present no obstacle to a judicial decree for performance of a contract. Equity deals with the substance, not the form, when it seeks to enforce its decrees. This was in effect held in Bald Eagle Valley Railroad v. Nittany Valley Railroad, 171 Pa. 284. Counsel are mistaken in assuming the decision in that case was based solely on Tulk v. Moxhay, 2 Phil. 774. The court below, in the case first cited, had based its decree on Spencer's case, and Keppell v. Bailey, 2 Myl. & K. 517; Tulk v. Moxhay was cited by us as overruling Keppell v. Bailey, and deciding that where the covenant was, the purchaser and his assigns would use or abstain from using the land in a particular manner, that equity would enforce the covenant against all purchasers with notice of it. The doctrine of that case has been applied in later cases in England only to restrictive covenants. But this court has not so limited the principle, by confining the administration of equity in like cases to a restraining order; to accomplish equity, where there is no adequate remedy at law, often demands mandatory orders : Thou shalt do, as well as, thou shalt not. True, the restrictive order is generally more easily enforced than one purely mandatory; in practice, often, the latter is incapable of

enforcement; but where such order can be enforced in aid of an equitable decree it will be issued, and ought to be. In the mere change of name and personnel of the boards we see no serious obstacle to a mandatory writ in aid of a restraining order.

It is further argued that as the term for which the contract was made is not fixed, therefore it continued only during the will of the parties, and might be revoked by either on notice. This, as a general proposition, if the fact were as stated, is correct, and it is so held in Phila. etc. Railroad v. River Front Railroad, 168 Pa. 357, and the authorities there cited. But the term in this contract is fixed by the plainest implication; the bonds to be purchased ran for thirty years; the obligation of plaintiffs was to set aside annually fifteen per cent of the gross receipts, to be used in annual purchase of the bonds. The term of defendants' obligation under the joint contract must be co-extensive as to time with plaintiffs' obligation to set aside and pay; that is, thirty years.

Nor is the contract so indefinite in its terms that performance cannot be decreed; for nine years they operated their roads under the agreement without, so far as appears, finding it necessary to resort to the arbitration clause in case of dispute; its indefiniteness is first alleged when a motive exists for breaking the contract. While the exact details by which each shall receive and transport promptly the other's traffic, and how the joint earnings shall be apportioned on a mileage basis, cannot now be particularized by the court, the primary stipulations of the contract are definite, and as to them has been entered a decree that they shall be performed specifically; the purpose of defendants to stop the interchange of traffic under the contract has been arrested by this decree; the contract is now obligatory upon all the parties, and is to be performed according to its manifest intent; when this is done in good faith, the daily operations of the respective roads alone can determine the exact details necessary to effective obedience of the decree. In case of dispute as to the particular methods, either can call into operation the arbitration clause, or if this be unavailing, either can, on proper proof, secure from the court below a supplementary decree, which in the light of the evidence that may then be adduced will carry out fully the decree already made. While parties to such contract can agree definitely that they will pro-

mote and facilitate the interchange of cars and business between their respective roads, and that the earnings from the joint business shall be apportioned on a mileage basis, it would be practically impossible to enumerate in the agreement all the details by which it should be carried into effect; these would necessarily have to be postponed until the daily operations of the road suggested what would best promote their convenience and that of the public.

As to the appeal of the Gettysburg & Harrisburg Railway Company, it is dismissed and the decree affirmed.

For the reasons given by the court below, the decree as against the Philadelphia & Reading Railroad Company, the Hunter's Run & Slate Belt Railroad Company and the receivers of the Philadelphia & Reading Railroad Company is affirmed, and their appeals dismissed.